UNITED STATES of America, Plaintiff–Appellee,

v.

Fred SAULTER and Ilander Willis, Defendants–Appellants.

Nos. 94–2442 and 94–2473.

United States Court of Appeals, Seventh Circuit.

Argued June 1, 1995.

Decided July 6, 1995.

Rehearing Denied Aug. 9, 1995.

---

Scott A. Verseman, Michele Schroeder (argued), Office of U.S. Atty., Rockford, IL, for U.S.

John R. Truitt (argued), Nash & Truitt, Rockford, IL, for Fred Saulter.

Frank P. Vella, Jerry A. Lund, Vella, Sparkman, & Altamore, Rockford, IL, Kevin E. Milner, Leonard C. Goodman (argued), Chicago, IL, for Ilander Willis.

Before COFFEY, FLAUM, and MANION, Circuit Judges.

FLAUM, Circuit Judge.

Defendants Fred Saulter and Ilander Willis were convicted of conspiring to distribute and distributing cocaine and cocaine base, popularly known as crack. In this joint appeal, Saulter asserts that the government presented insufficient evidence with which to convict him and disputes the admission of certain evidence against him. Saulter also contests the admission of conversations recorded by one cooperating witness, while both defendants object to another cooperating witness's interpretation of different recorded conversations to which the witness was not a party. Willis separately challenges the admission of allegedly cumulative expert testimony regarding the manufacture of crack and makes several objections to his sentence. We affirm.

I.

Melvin Jones, a convicted criminal cooperating with the government by making undercover drug purchases, visited Ma & Pa Beasley's restaurant in Rockford, Illinois, on June 8, 1993. He had previously bought cocaine from Willis and his co-conspirators, including Saulter, James Henry, and Wilbert Barber, at this site and at Willis's apartment, located at 932 Lincoln Street in Rockford. That day, Jones, wearing a tape recording device, asked Henry where he could find Willis. Henry unsuccessfully attempted to locate Willis and then told Jones to return later. Jones went instead to the Lincoln apartment and asked Saulter for Willis and an ounce of cocaine. Willis told Saulter to accompany Jones to the restaurant, where Henry would take care of Jones. During the drive over, Saulter offered to "cook" the cocaine for Jones, meaning he would convert it into crack; Jones declined the proposal. After discussions between Saulter and Henry at the restaurant, Saulter sold Jones one ounce of cocaine (later found by the FBI to equal only twenty-two grams) for $1,400.

On June 15, Jones met with Willis, Henry, and a man named "Judo" at the Spiff 'Em Up Car Wash. The men first discussed Saulter's ability to cook cocaine, and Jones said he wanted to contact Saulter. When Willis asked if he had an ounce to cook, Jones responded that he wanted to buy one from Willis. Willis directed Judo to go with Jones to the Lincoln apartment to discuss the purchase and cooking with Saulter.

After obtaining money from the FBI (which gave him only enough for one-half ounce), Jones went to Ma & Pa Beasley's where he discussed the price for one-half ounce with Willis. Willis instructed someone called "Fishman" to get the cocaine. Jones paid Fishman $550, but did not immediately receive the drugs. Jones then followed Judo to the Lincoln apartment and another loca-

tion, but the men could not find Saulter. Judo subsequently handed Jones the cocaine.

On July 1, Jones once again went to Ma & Pa Beasley's and spoke with Henry about purchasing an ounce of cocaine for Saulter to cook. After obtaining the cocaine from Henry, Jones went to the Lincoln apartment, where Henry said Saulter was expecting him. When Jones arrived Saulter cooked the cocaine, resulting in nineteen grams of crack. Jones recorded all of these conversations and, at trial, identified the conspiracy members' voices as well as interpreted their discussions.

Donald Box, a member of another large-scale drug operation in Rockford, also bought cocaine from Willis and his organization. Sometime during the spring of 1992, Box purchased two kilograms from Willis at the Lincoln apartment. He later returned the drugs for a refund because an ounce he had cooked had failed to harden into crack. In late June or early July, 1993, Box requested one kilogram from Willis. Saulter and Willis delivered that quantity to Box at Ma & Pa Beasley's parking lot. After being arrested on drug charges, Box agreed to cooperate with the government and testified at Willis and Saulter's trial about these purchases.

The FBI obtained, in another investigation, legal wiretaps of the cellular phone belonging to Karl Fort, one of Box's co-conspirators, and a phone at the Spiff 'Em Up Car Wash. The agency recorded several conversations between Willis and Fort. During the first, on June 4, 1993, Willis asked Fort if is was okay to send Saulter over to see him, to which Fort agreed. Willis then mentioned the "soft thing" and described it as good. Box testified that Willis was referring to the texture of cocaine.

On June 7, Box and Fort told Willis that the one-half kilogram of cocaine they had purchased from him was five ounces short. Willis said he would make it up the next time and then quoted Fort a price of 25 per "pie." Box stated this meant $25,000 per kilogram of cocaine. On June 9, Fort spoke with Saulter and Willis. He told the men that the "pie" was straight. Box testified that this referred to a kilogram of good cocaine Fort had recently purchased from Willis.

FBI agents executed a search warrant at the Lincoln apartment on July 28, 1993. They seized a wallet containing $772 and an additional $1,545 from elsewhere in the apartment, all later identified as belonging to Barber. The agents also recovered two police scanners, a walkie-talkie, a hand-held scanner, two loaded firearms, two utility bills addressed to Barber, and two letters addressed to Willis.

On December 21, 1993, Willis, Saulter, Barber and Henry were indicted for conspiring, from 1989 to July 28, 1993, to distribute cocaine and mixtures containing cocaine base, in violation of 21 U.S.C. § 846. Willis also was charged with two counts of distributing cocaine, while Saulter was charged with one count each of distributing cocaine and distributing crack, all in violation of 21 U.S.C. § 841(a)(1). Barber and Henry pleaded guilty, but Willis and Saulter jointly stood trial. The jury found both defendants guilty on all charges against them. The district court sentenced Saulter and Willis to 120 and 240 months imprisonment, respectively, both terms to be followed by 8 years of supervised release. This appeal followed.

## II.

Willis and Saulter make several evidentiary challenges. Saulter first contends that there was insufficient evidence to allow his convictions to stand, and objects to the admission against him of evidence seized from the Lincoln apartment. Both defendants object to the admission and interpretation of certain recorded conversations. Willis independently insists that the court should not have allowed an expert to testify about the process of manufacturing crack.

## A.

■ Saulter contends that the government presented insufficient evidence with which to convict him. He asserts that because his convictions rest so heavily on the testimony of Jones and Box, two completely unbelievable witnesses, the jury's verdict cannot stand. We will uphold a verdict against a defendant if "after viewing the evidence in the light

most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original). This standard places a heavy, although not insurmountable, burden on a defendant challenging the sufficiency of the evidence. *See, e.g., United States v. Theodosopoulos,* 48 F.3d 1438, 1449 (7th Cir.1995).

■ "Questions of credibility are solely for the trier of fact, [so] such arguments are 'wasted on an appellate court.'" *United States v. Marin,* 7 F.3d 679, 688 (7th Cir. 1993) (quoting *United States v. Ruiz,* 932 F.2d 1174, 1178 (7th Cir.), *cert. denied,* 502 U.S. 849, 112 S.Ct. 151, 116 L.Ed.2d 116 (1991)), *cert. denied,* —— U.S. ——, 114 S.Ct. 739, 126 L.Ed.2d 702 (1994). We will not reevaluate the credibility of testimony even if it is "totally uncorroborated and comes from an admitted liar, convicted felon, large-scale drug dealing, paid government informant." *United States v. Wilson,* 31 F.3d 510, 513 (7th Cir.1994). We will overturn a conviction based on a credibility determination only when a witness's testimony was incredible as a matter of law, meaning it would have been "'physically impossible for the witness to observe that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all.'" *United States v. Wallace,* 32 F.3d 1171, 1173 (7th Cir.1994) (quoting *United States v. Wyhe,* 965 F.2d 528, 531 (7th Cir.1992)).

■ Saulter has not established that either Jones or Box's testimony was incredible as a matter of law. Instead, he points out that both received sentencing leniency for their cooperation with the government, that Jones admitted he would lie when it served his purposes, that he stole money from the government while working for it, and that Box gave inconsistent testimony in different judicial proceedings. Saulter had the opportunity to and actually did present these facts and inconsistencies to the jury, which still chose to believe the government's witnesses. That is the jury's prerogative and, on the record in this case, a decision we uphold. *See United States v. Henderson,* 58 F.3d 1145, 1149–50 (7th Cir.1995). Together with the challenged testimony, the government's evidence, which includes tape recordings of Saulter conducting drug deals, adequately supports his convictions.

**B.**

■ Saulter and Willis make several challenges to the admission of tape recorded conversations. We review evidentiary rulings for abuse of discretion. *United States v. Dominguez,* 992 F.2d 678, 680–81 (7th Cir.), *cert. denied,* —— U.S. ——, 114 S.Ct. 250, 126 L.Ed.2d 203 (1993); *United States v. Lashmett,* 965 F.2d 179, 181 (7th Cir.1992). Even if we find error, we will not reverse if that error was harmless. *Dominguez,* 992 F.2d at 681; *Lashmett,* 965 F.2d at 181.

■ Saulter first objects to the admission of conversations recorded by Jones because only Jones identified Saulter's voice, thereby providing the sole evidence implicating him in the crimes. Jones participated in these conversations, as stipulated by Saulter. He therefore had an ample basis for identifying the other voices and the court did not abuse its discretion by admitting the recordings. Any other objection to Jones's identification is simply another challenge to his credibility. *See Henderson,* 58 F.3d at 1149; *see also United States v. Alvarez,* 860 F.2d 801, 809 (7th Cir.1988), *cert. denied,* 490 U.S. 1051, 109 S.Ct. 1966, 104 L.Ed.2d 434 (1989), *vacated on other grounds,* 956 F.2d 1165 (1992). The jury believed Jones, a decision, as discussed above, we will not reverse.

Saulter and Willis also object to the admission of the wiretapped communications between Fort, Willis, and Saulter. They assert that the court erred in allowing Box, who was not a party to those conversations, to identify Fort and Willis' voices and interpret cryptic words spoken by them. Before discussing the recordings, Box testified that he could identify the speakers because he knew the men. Certainly this is true of Fort, with whom Box was involved in a large-scale drug conspiracy. The defendants maintain that Box did not have sufficient contacts with Willis; Box testified at an unrelated grand jury proceeding that he had purchased co-

caine from Willis a "couple of times." On direct examination at this trial, Box stated he had made six or seven such purchases but on cross-examination admitted buying personally from Willis only twice. As the government counters, however, Box and Willis' organizations had more extensive dealings with each other and the number of purchases Box made directly from Willis does not necessarily correspond to the number of times he spoke with the man; Box also testified he had met with Willis during another deal and had spoken with Willis at least four other times regarding quantities the Box organization desired to purchase.

■ FED.R.EVID. 901(a) allows voice identification to be made "by opinion based upon hearing the voice at any time under circumstances connecting it with the alleged speaker." We have held that "minimal familiarity is sufficient for admissibility purposes." *United States v. Degaglia,* 913 F.2d 372, 376 (7th Cir.1990) (internal quotations omitted). Thus, even if Box had conversed with Willis only during the two "personal" purchases, we believe that those meetings form a sufficient basis for the admission of the tapes and Box's identification. *See id.* at 376 n. 2 (collecting cases upholding the admission of recordings and identification of voices).

■ As to Box's interpretation of certain words spoken by Fort and Willis, a lay witness can testify as to his opinion when it is "rationally based on the witness' perceptions and . . . is helpful to the development of evidence at trial."[1] *United States v. Allen,* 10 F.3d 405, 414 (7th Cir.1993) (quoting *United States v. Giovannetti,* 919 F.2d 1223, 1226 (7th Cir.1990)); *see also* FED.R.EVID. 701. "Rationally based" requires that the witness's opinion be grounded in his personal knowledge. *See Allen,* 10 F.3d at 414; FED. R.EVID. 602. Rule 701 does not require that the witness actually have participated in the recorded conversations. We believe it suffi-

cient that the witness has personal knowledge of the subject discussed and the persons involved. Here, Box was an admitted drug dealer. As such, he had at least similar knowledge of the relevant terms as federal agents who routinely testify, albeit as experts, about the meaning of drug phrases. *See, e.g., Romero,* 57 F.3d at 570; *Hughes,* 970 F.2d at 236; *United States v. Briscoe,* 896 F.2d 1476, 1497 (7th Cir.), *cert. denied,* 498 U.S. 863, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990). More important, Box not only had knowledge of the terms being used from his general drug dealings, but also was a member in the same organization as Fort and had personal knowledge of Fort's behavior and speech. Box thus possessed the requisite experience on which to base his opinion as to the meaning of certain words and to admit those interpretations at trial. The court did not abuse its discretion.[2]

### C.

■ Saulter next objects to the admission against him of evidence seized from the Lincoln apartment because the government did not prove that he owned any of it. The district court specifically found that the evidence seized, including money, guns, and police scanners, was relevant to the charged crimes, a determination to which we defer. *See United States v. Ramirez,* 45 F.3d 1096, 1103 (7th Cir.1995) (upholding admission of a gun as a "tool of the [drug] trade"); *United States v. Nava–Salazar,* 30 F.3d 788, 798 (7th Cir.) (upholding admission of records of drug transactions as "tools of the trade"), *cert. denied,* —— U.S. ——, 115 S.Ct. 515, 130 L.Ed.2d 421 (1994).

■ In this case, the government presented ample evidence connecting Saulter to the charged conspiracy and to the Lincoln apartment. Saulter disputes that conclusion because Jones provided the only nexus

---

1. We have previously held that juries may need assistance understanding drug-related terms. *See, e.g., United States v. Romero,* 57 F.3d 565, 571 (7th Cir.1995); *United States v. Hughes,* 970 F.2d 227, 236 (7th Cir.1992).

2. Saulter's argument that these recordings were irrelevant or contained hearsay has no merit.

The tapes were relevant to show specific drug deals and the conspiracy members' participation in a large-scale distribution organization. Statements by a co-conspirator in furtherance of a conspiracy or by a party are not hearsay. *See* FED.R.EVID. 801(d)(2)(A), (E).

through his identification of Saulter's voice, but we again reject this challenge to the jury's credibility determination. Once a defendant has joined a conspiracy, as shown here, he can be held liable for all acts of his co-conspirators in furtherance of the conspiracy that he could have reasonably foreseen. *United States v. Donovan*, 24 F.3d 908, 914 (7th Cir.), *cert. denied*, — U.S. —, 115 S.Ct. 269, 130 L.Ed.2d 187 (1994); *United States v. Gutierrez*, 978 F.2d 1463, 1468 (7th Cir.1992). Not all evidence against an alleged co-conspirator is always admissible against a defendant, but evidence relating to the charged conspiracy, as in this case, can be so used. *See Nava–Salazar*, 30 F.3d at 798 (upholding admission of evidence found in one conspirator's house against all conspirators because they were relevant to show the charged conspiracy); *United States v. Molinaro*, 877 F.2d 1341, 1345–46 (upholding admission of one co-conspirator's drug paraphernalia against the defendant because it was relevant to the charged conspiracy); *see also Donovan*, 24 F.3d at 915 (no error in refusing to sever trial because alleged "spillover" evidence against certain co-defendants was simply evidence of the single charged conspiracy). The court did not abuse its discretion in admitting the evidence against Saulter.[3]

D.

The government presented Detective Bruce Olson of the Rockford Police Department as an expert on the street level narcotics trade. He testified, in part, about the process of manufacturing crack from cocaine. Willis challenges the admission of this testimony, claiming it was cumulative and thus unnecessary to the jury's understanding of the evidence because Jones, corroborated by a recording, had previously testified to the steps taken by Saulter. *See* FED.R.EVID. 703 (expert testimony must assist the trier of fact). Willis also asserts that the court should have excluded the evidence as overly prejudicial under FED.R.EVID. 403.

The fact that a cooperating witness has testified to certain facts does not automatically prevent an expert from testifying on the same subject. However, in *United States v. Cruz*, 981 F.2d 659, 664 (2d Cir.1992), the Second Circuit stated that the government could not present expert testimony "solely to bolster the credibility of [its] fact-witnesses by mirroring their version of the events." *See also United States v. Castillo*, 924 F.2d 1227 (2d Cir.1991). While we recently distinguished these cases, *see Romero*, 57 F.3d at 570–571 we did so because *Cruz* and *Castillo*, unlike *Romero*, involved expert testimony on subjects not beyond the understanding of the jury. *Compare Cruz*, 981 F.2d at 662 (jury could comprehend on its own why drug dealers would use intermediaries) *and Castillo*, 924 F.2d at 1233 (jury did not need an expert's explanation to discern why the defendants would hold a gun to an undercover purchaser's head and force him to snort some of the cocaine he had just bought from them or what use they would have for a scale and index cards) *with Romero*, 57 F.3d at 570 (jurors would not independently understand the difference between quantities of drugs used for personal consumption versus sale, the methods of packaging cocaine, or code words used by drug dealers so the court properly admitted expert testimony on those subjects). We did not, and do not, disagree with the Second Circuit's statement quoted above. The instant case remains distinguishable, however, and Detective Olson's testimony was properly received.

On direct examination, Detective Olson described the process of manufacturing crack, a subject, as in *Romero*, likely beyond the ken of the average juror. The government presented this testimony presumably so the jury could understand that Saulter could actually perform the procedure. Furthermore, the government did not use Detective Olson's testimony as a crutch for Jones's testimony. The Second Circuit was especially troubled in *Cruz* and *Castillo* by the government's heavy reliance, during summation, on expert testimony to support the credibility

---

**3.** Nor do we find the prosecution's failure to establish that the scanners and walkie-talkie worked properly requires a reversal. Saulter could have elicited such information but did not do so.

of its fact-witnesses and to show that the defendants acted in conformance with other guilty persons. *Cruz,* 981 F.2d at 663; *Castillo,* 924 F.2d at 1234–35. *See Headley v. Tilghman,* 53 F.3d 472 (2d Cir.1995) (distinguishing these cases on the grounds discussed). The government here did not mention Detective Olson's testimony at all during its closing argument. Although the government asks us to uphold the admission of this evidence in part because the defense had thoroughly impeached Jones, who had already given similar testimony, the prosecution did not make that point to the jury. Because Detective Olson testified about a process not readily understandable by the average juror and the government did not use the testimony solely to corroborate Jones's testimony, we reject Willis's argument.

■ As to Willis's Rule 403 challenge, we note that this evidence was relevant to the conspiracy. Jones testified how Saulter cooked the cocaine, a process recorded on tape. The government presented ample evidence of Saulter's ability to manufacture crack and of Willis's knowledge that Saulter did so. In addition, Willis helped Jones locate Saulter to have him carry out the conversion. The jury could have concluded that Saulter's conduct was part of the conspiracy and that Willis reasonably foresaw Saulter's action. We fail to see any unfair prejudice from the evidence, let alone enough to substantially outweigh its probative value, as required for exclusion under FED.R.EVID. 403. The court therefore did not err in admitting Detective Olson's testimony.

### III.

■ Willis separately challenges four aspects of his sentence: the amount of controlled substance the court attributed to him, the credit he received for Saulter's manufacture of crack, and the enhancements he received for being an organizer or leader and for committing the crimes while under a criminal justice sentence. The government must prove the facts underlying sentencing determinations by a preponderance of the evidence, *United States v. Linnear,* 40 F.3d 215, 218 (7th Cir.1994), and a defendant has the right to be sentenced based on testimony with a "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a); *see United States v. Beler,* 20 F.3d 1428, 1432 (7th Cir.1994). We review the court's factual findings on sentencing for clear error. *United States v. Fones,* 51 F.3d 663, 665 (7th Cir.1995).

### A.

We first address Willis's challenge to the quantity of drugs the court attributed to him in setting his base offense level under the sentencing guidelines. In addition to the amounts Willis was convicted of distributing (thirty-three grams of cocaine and nineteen grams of crack), the court credited Willis with several purchases discussed by Box: two kilograms Box stated he purchased from Willis in the spring of 1992; one-half kilogram he bought from Willis around June 7, 1993; and one kilogram he purchased from Willis and Saulter in late June or early July, 1994. The court also credited to Willis one kilogram Fort purchased from him, as evidenced by a June 9, 1993, recorded conversation. Willis challenges these figures on several grounds.

■ Willis asserts that the court erred in attributing the two kilograms Box purchased from him in the spring of 1992, because the government failed to prove that the substance was a mixture containing cocaine. Box testified that after receiving the substance he attempted to "cook" one ounce, which would not harden as it cooled. When he told Willis about the problem, Willis told Box to return it for a refund, which Box did. Willis argues that because the government presented evidence demonstrating how cocaine cooks and then hardens and because the government's own witness stated that this substance would not do so, the United States did not meet its burden.

We disagree. The government presented ample evidence that Willis sold cocaine, thus leading to the reasonable inference that this substance also contained cocaine. Box never testified that he believed the mixture contained no drugs but was only a look-alike substance. We cannot expect the govern-

ment to anticipate all possible arguments and cannot fault it for not presenting testimony regarding other explanations for the ounce's failure to harden. Willis could have pursued this argument at trial or sentencing but did not do so. We therefore conclude that the government's evidence regarding other sales adequately supports the court's decision to count this quantity.

Next, Willis challenges Box's testimony as unreliable. Inasmuch as his argument rests on Box's cooperation agreement, his prior addictions to cocaine and heroin, and his impeachment through prior inconsistent statements, we reject it. In addition to Willis's convictions, which demonstrate the jury's belief, at least to some extent, of Box's testimony, the court found his testimony regarding these amounts specific and credible. We give great deference to such credibility determinations. *See, e.g., United States v. Pitz,* 2 F.3d 723, 727 (7th Cir.1993), *cert. denied,* — U.S. —, 114 S.Ct. 2141, 128 L.Ed.2d 869 (1994).

■ Willis also maintains that the court erred in crediting all three transactions Box testified to taking part in when Box stated on cross-examination that he had only purchased drugs from Willis twice. Our review of the transcript indicates that Box testified he had twice put something in Willis's hand in exchange for something directly from Willis—the two kilogram and the one-half kilogram purchases. Box recounted that Saulter actually handed him the cocaine during the late June or early July deal. Based on this testimony, the court did not clearly err in finding no inconsistency that prevented it from counting all three quantities. We reach the same conclusion regarding Box's allegedly inconsistent testimony about who was present during the transactions. Willis asserts that Box stated that he and Willis were alone during all of their transactions. A more plausible reading of Box's testimony, however, is that only the two men were present during the spring, 1992 transaction. Box thus did not contradict himself when he

testified to Saulter's participation in the final purchase.

Finally, Willis contends that the court likely engaged in impermissible double-counting by attributing to him the kilogram Box testified to receiving in late June or early July and the kilogram Fort discussed with Willis on June 9, 1993. The court was aware of the potential double-counting problem and specifically found Box's testimony believable regarding both transactions. It did not clearly err in deciding to credit both purchases.[4]

### B.

Willis also objects to being credited with the nineteen grams of crack manufactured for Jones by Saulter. The twenty-eight grams of cocaine Willis originally sold to Jones, after being converted to nineteen grams of crack, counted for sentencing as 1,900 grams of cocaine. *See* U.S.S.G. § 2D1.1 (equating one gram of cocaine to 100 grams of crack). Willis argues that this constitutes sentencing entrapment because Jones had no reason to insist on the cooking other than to increase the quantity of drugs involved.

Jones relies on *United States v. Sheperd,* 857 F.Supp. 105 (D.D.C.1994), as support for his sentencing entrapment argument. In that case, the defendant offered to sell only cocaine, but the undercover agent involved twice insisted she first cook the substance. The court stated that the government had not indicated how the agent's request furthered its investigation. To the contrary, the agent had testified in an unrelated case that he insisted on conversion because he knew of the heavier penalties attached to the sale of crack. The agent had also testified in that proceeding that his office's policy was to request the manufacture in order to increase criminal sentences. *Id.* at 109. The court concluded that because the agent insisted on receiving crack only in order to unfairly manipulate the defendant's sentence, the court would sentence her based on the amount of cocaine, not crack, she had sold, resulting in a reduction of at least 60 months. *Id.* at 111.

---

**4.** We reject Willis's claim that the court could not use the kilogram discussed on the wiretap because Box did not have personal knowledge of that conversation for the same reasons we rejected Saulter and Willis's challenge when made regarding their convictions. *See, supra* at pp. 6–8.

■ Whatever its persuasiveness, *Shepard* is wholly distinguishable from the instant case. Here, Saulter first offered to cook the cocaine he had provided, a proposition Jones initially refused. Jones broached the subject himself on June 15, 1993, stating that he needed Saulter to make the conversion for him. Willis questions why Jones needed that service, and argues that Jones's request is the same as the agent's insistence in *Shepard*. We believe, however, that Jones's request legitimately furthered the government's investigation. After Saulter proposed the manufacture, the government would naturally want to see if he would follow through with his offer. Although Willis correctly asserts that no evidence demonstrated any other sales of crack by his organization, that does not mean the government had no appropriate basis for seeking the cooking. Especially in light of the complete absence of any evidence indicating that Jones and the government requested the manufacture solely to increase Willis's sentence,[5] Saulter's offer sufficiently supports the government's action.

### C.

■ Third, Willis contends that he should not have received a two-level enhancement for committing a crime while under a criminal justice sentence, which includes probation. U.S.S.G. § 4A1.1(d). Willis was on probation for a prior gambling offense until May 29, 1992, and probationary periods constitute criminal justice sentences for purposes of § 4A1.1(d). The court imposed the enhancement after finding Box's testimony about his purchase of two kilograms of cocaine from Willis in the spring of 1992 credible. Willis does not argue that no sale took place, but contends that the court's finding that the sale occurred before May 29 is clearly erroneous because spring continues until June 21. The government responds that we should uphold the court's determination because the common understanding of spring includes only March, April, and May, thereby making it most probable that the sale occurred before the end of Willis's probation.

Webster's Dictionary defines spring in both ways. Webster's Ninth New Collegiate Dictionary 1142 (Frederick C. Marsh, ed. 1990). Using either meaning, the government proved that more likely than not, in other words, by a preponderance of the evidence, the sale occurred before May 29; either way, the vast majority of spring had elapsed before that date. We might have a different case had Willis contested the fact of sale, rather than merely its timing, but he did not. We would prefer that the government had presented more precise evidence in support of the enhancement, but the court did not clearly err by relying on Box's testimony, regardless of his failure to identify a specific date.

### D.

■ Finally, Willis objects to receiving a four level enhancement for being an organizer or leader of an organization with five or more participants. U.S.S.G. § 3B1.1(a). Willis does not challenge the court's characterization of him as an organizer or leader, but rather argues that the court incorrectly found five people participated in the conspiracy. The guidelines define a participant as "a person who is criminally responsible for the commission of the offense, but need not have been convicted." U.S.S.G. § 3B1.1, application note 1. The court counted Willis, Saulter, Barber and Henry and then found that Judo was also a participant in the organization.

Jones testified that on June 15 he attempted to locate Saulter to cook some cocaine he hoped to purchase from Willis. After agreeing on an amount and price, Willis told Jones that Judo knew where to find Saulter. Willis stated: "Judo say[s Saulter's] at home. If you want to, you can ride with Judo. He'll take care of you." Willis had earlier told Judo to follow Jones to the Lincoln apart-

---

5. Other evidence indicates that the government was not solely interested in increasing Willis's sentence. On June 15, Jones originally stated he wanted to purchase an ounce of cocaine, to which purchase Willis agreed. When Jones went to the FBI's office to obtain the money, the agency gave him only enough to purchase ½ ounce. While there may be many reasons for not authorizing the full purchase, the FBI's refusal indicates that it did not act only to manipulate Willis's term of imprisonment.

ment.   Jones testified that before leaving Ma & Pa Beasley's, he never saw the cocaine he had paid for.   Only after failing to locate Saulter did Judo give Jones the cocaine.

The district court accepted this testimony and based on it, characterized Judo as a participant.   Willis contends that Judo was merely tagging along with Jones.   He argues that Jones's statement that Judo handed him the cocaine is clearly a lie because the tapes show Jones had already received the drugs before leaving the restaurant.   While this scenario is possible, the transcripts of the relevant recordings are also consistent with Jones's account, and the court could have reasonably relied on his testimony.   Based on Judo's assistance in locating Saulter to perform an act in furtherance of the conspiracy as well as Judo's handing the cocaine to Jones, the court did not err in calling him a participant.   *See United States v. Amaechi*, 991 F.2d 374, 377 (7th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 2980, 125 L.Ed.2d 677 (1993).

For the foregoing reasons, we AFFIRM the convictions of Saulter and Willis, and AFFIRM Willis's sentence.