70 F.3d 1275
 NOTICE: Seventh Circuit Rule 53(b)(2) states unpublished orders shall not be cited or used as precedent except to support a claim of res judicata, collateral estoppel or law of the case in any federal court within the circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
Moses HAMDAN, Defendant-Appellant.
 No. 95-1301.
 United States Court of Appeals, Seventh Circuit.
 Argued Oct. 3, 1995.
Decided Nov. 17, 1995.
 ORDER
 
 1
 Moses Hamdan ("Moses"), who was convicted of conspiracy to possess cocaine with intent to distribute, 21 U.S.C. Sec. 846, and possession of cocaine with intent to distribute, 21 U.S.C. Sec. 841(a)(1), claims that the government failed to present sufficient evidence to prove him guilty beyond a reasonable doubt because the government's prime witnesses were simply not credible. We affirm.
 
 
 2
 The defendant was indicted in the first two counts of the government's "Second Superseding Indictment" against him and his brother David Hamdan ("David"). The first count of the grand jury indictment charged David and Moses Hamdan with conspiring with a number of other known and unknown individuals to possess with intent to distribute multi-kilogram quantities of cocaine. The second count of the indictment charged David and Moses Hamdan with possessing with intent to distribute approximately fifty kilograms of cocaine on September 9, 1991. At trial, the government contended that Moses was guilty on this count because he was liable for the foreseeable offense of possession committed by his fellow conspirators in furtherance of the conspiracy. See Pinkerton v. United States, 328 U.S. 640, 647 (1946). Moses initially pleaded guilty, but later withdrew his plea. A jury found him guilty on both counts. He was sentenced to 210 months' imprisonment and five years' supervised release.
 
 
 3
 Hamdi Ayyash, Rosella De La Cruz, David Chandler and Abdullah Zaatrah testified against the defendant at trial. In exchange for their cooperation, the first three plea bargained for substantially lower sentences, and Zaatrah, who had already pleaded guilty before deciding to testify, reached an agreement with the government in which it promised to attempt to obtain a sentence reduction. Agent David Krieg of the Drug Enforcement Agency also testified. He discussed both the government's interactions with the other witnesses and the acquisition of numerous documents, including telephone records, hotel records and car rental receipts. This documentary evidence corroborates details of the witnesses' testimony concerning the activities of the conspiracy, but it does not conclusively prove the defendant's participation.
 
 
 4
 Although Moses does not appear to contest the sufficiency of the witnesses' testimony if it is accepted as credible, a brief history of the conspiracy is in order. The conspiracy had many levels. Moses and one of his siblings, David, operated as wholesale distributors of cocaine and other controlled substances. They initially obtained cocaine from sources in Chicago, Illinois. By 1991, Christina Isabella Restrepo ("Restrepo") placed them in contact with Thelma Zulima Buitrago, a major source of cocaine who lived in Houston, Texas. Over the years, Moses and David Hamdan acquired partners who assisted them in wholesale selling of cocaine, including Zaatrah, who had begun working for them in 1986 by receiving packages of marijuana mailed to his apartment. They also recruited others, such as De La Cruz, Ralph Mounts, Mahmoud Ayyash, who is Hamdi Ayyash's brother, and Jamal Hamdan, another one of Moses' brothers, to transport cocaine from Houston to Chicago. The brothers then sold this cocaine to dealers such as Hamdi Ayyash and, later on, Chandler, who is not mentioned in the indictment.
 
 
 5
 Zaatrah and Hamdi Ayyash provided information concerning the early days of this conspiracy to distribute cocaine. Zaatrah first discovered in late 1986 that Moses Hamdan was involved in distributing cocaine when Moses asked him to perform an act of vengeance against people who had beaten David Hamdan and Angelo Tollenichi, the Hamdans' partner, and robbed them of two kilograms of cocaine. It appears that Zaatrah declined. After this discovery, Zaatrah temporarily refused to receive any more packages for the Hamdan brothers at the end of 1986. However, he soon came to an agreement with David Hamdan, which Moses then confirmed. In 1987, David Hamdan informed Hamdi Ayyash, who had been purchasing cocaine from him since late 1985 or early 1986 in half kilogram quantities and later in kilogram quantities, that Moses was his partner. From 1987 to 1989, Hamdi Ayyash made payments to both David and Moses Hamdan, although he predominantly dealt with David. Hamdi Ayyash's purchases of cocaine slowed for roughly a year during 1988 and 1989, but then soon increased to two to five kilograms every other week.
 
 
 6
 Hamdi Ayyash described a variety of transactions from 1990 involving Moses Hamdan. In April 1990, Ayyash received two kilograms of cocaine directly from Moses at Moe's Supermarket. ("Moe's" stands for "Moses'.") A couple of weeks later, he placed an order with Moses and subsequently handed him $86,000, while a third person, "Danny," gave him two kilograms of cocaine. In mid-1990, he delivered "a couple hundred thousand" dollars directly to the defendant. Moses immediately hid the money in the legs of a pair of pants, put the pants into a suitcase and handed the suitcase to Ralph Mounts to take with him to the airport. In return for the money, Hamdi Ayyash later received cocaine. In November 1990, Ayyash called Moses to set up a purchase. On Moses' instructions, Hamdi Ayyash went to Danny's car, took two kilograms of cocaine from a secret compartment and left money. A month later, Ayyash set up another two-kilogram transaction, although Ayyash later decided to purchase only one kilogram and to leave $86,000 in surplus funds to be credited on his account.
 
 
 7
 In early October 1990, Zaatrah was arrested for receiving a package of marijuana. Because he did not turn in the Hamdan brothers, the brothers made him a partner. However, according to Zaatrah, instead of taking a full share of the profits, he chose to draw off only $400 or $500 per week from the available cash to cover his needs. He explained that he had done so because "[w]e were waiting for the big score...." (Tr. at 697.)
 
 
 8
 In late 1990, David Hamdan began to use Restrepo's connections in Houston to obtain cocaine. In February 1991, Zaatrah and Nader and Jamal Hamdan, Moses' brothers, smuggled $170,000 in a moving van to San Antonio, Texas, where they met with David Hamdan and Restrepo. Zaatrah returned with $80,000 worth of marijuana, while David and Restrepo took the rest of the money to Houston. David Hamdan later told Zaatrah that he obtained six kilograms in Houston and that Ralph Mounts transported it to Chicago. Hamdi Ayyash testified that by April 1991, after the Houston connection was established, he purchased three to eight kilograms of cocaine either every week or every other week.
 
 
 9
 In April 1991, Moses Hamdan, who was unable to contact Mounts, asked Zaatrah to go with Jamal Hamdan to Houston. Zaatrah flew to Little Rock, Arkansas, and drove from there to Houston, where he stayed at a Hilton Hotel with Jamal Hamdan, David Hamdan and Restrepo. Telephone records from the Hilton show calls to Moe's Supermarket and to David Hamdan's private cellular telephone. While in Houston, they obtained cocaine. After a housekeeper had moved a bag containing cocaine, they feared detection and quickly left Houston for Chicago in two cars.
 
 
 10
 According to Hamdi Ayyash, he sold his excess cocaine to Moses on two occasions a few days apart in August 1991. In both instances, Ayyash dealt with Moses over the phone and then delivered the cocaine to Zaatrah at a shopping center by 87th Street and the Southwest Highway. Zaatrah also testified that he asked Moses to contact Hamdi Ayyash on his behalf in order to obtain cocaine in late July or early August, while David Hamdan was in Texas. Although details of the transactions differ, the defendant has not raised such potential discrepancies on appeal.
 
 
 11
 In August 1991, there were also significant events concerning the transportation of cocaine from Houston. On August 7, 1991, Arkansas authorities arrested Ralph Mounts, who was in possession of sixty kilograms of cocaine. Mounts had listed Moe's Supermarket as his employer on the lease for the car that he had rented. On either the day of Mounts' arrest or the following day, Mounts' brother Everett Mounts called Moe's Supermarket, but would not explain to David Hamdan the nature of the emergency. Moses Hamdan returned Everett Mounts' call and then informed Zaatrah and David Hamdan of the arrest. Moses later told Zaatrah that $600,000 had been taken to Houston and that Mounts had possessed sixty kilograms of cocaine. Restrepo found a Houston attorney to represent Mounts. Although Zaatrah could not recall precisely, he thought that Moses had instructed David Hamdan to pay Mounts some money.
 
 
 12
 Prior to Mounts' arrest, David Hamdan had already scouted out De La Cruz as a possible driver. De La Cruz had previously been involved in a few purchases of marijuana from Moses in 1983 and either 1988 or 1989. In August 1991, she flew down to Houston with David Hamdan, Mahmoud Ayyash and her teenage son. According to records from the Hilton Hotel at which they stayed, De La Cruz was registered from August 14 to 15, 1991. However, she was not used as a driver on this trip.
 
 
 13
 In early September 1991, David Hamdan called Hamdi Ayyash from Houston and said that he had cocaine. David asked Ayyash to collect money and to give it to Moses. After Hamdi Ayyash had collected roughly $100,000, Moses instructed him to go to Restrepo's mother's house; upon arriving there, he was sent to Moe's Supermarket. Ayyash met with Moses in front of the store, dropped off the cash at the back of the store, and discussed the Houston trip with Moses on the way out. The next day, Moses told Hamdi Ayyash to have his brother Mahmoud Ayyash meet him at the airport.
 
 
 14
 According to De La Cruz, Moses drove her and Jamal Hamdan to the airport on September 4, 1991, for a second tip to Houston. At the airport, they met Mahmoud Ayyash. Moses gave them the plane tickets. David Hamdan picked them up at the airport in Houston and took them to the Hilton Hotel. De La Cruz left in a red truck on September 8, 1991, with Mahmoud Ayyash and Jamal Hamdan following her to Chicago. However, she was separated from them. She called Moe's Supermarket and talked to someone that she identified as Zaatrah; he advised her to continue on her own. (Zaatrah made no mention of receiving such a call in his testimony.) De La Cruz arrived in Chicago at 1:00 a.m. on September 9, 1991. David Hamdan called her that morning and then went to her home. After waiting a while and making comments about Moses being late, David Hamdan drove off in the truck. Zaatrah testified that David Hamdan called him to say that he could no longer wait for Moses and was leaving.
 
 
 15
 Later on September 9, 1991, Hamdi Ayyash was arrested after attempting to purchase drugs from a DEA agent at Ayyash's apartment in Bridgeview, Illinois, that Ayyash maintained for drug transactions. He had been trying to purchase cocaine from the agent. In the apartment, Hamdi Ayyash had eleven kilograms of cocaine, which he had received from David Hamdan earlier that day, and $317,000. A red truck that matched the one driven by De La Cruz from Houston to Chicago was found behind Hamdi Ayyash's business. Ayyash stated during his debriefings with the DEA agents that it had been used to smuggle thirty-four kilograms of cocaine from Houston to Chicago. Agents also recovered several of Ayyash's notebooks or address books. Hamdi Ayyash identified his associates in these books by number. David Hamdan's number was "888," and Moses' number, although not listed within these books, was "007." However, the books only recorded activity for the preceding few weeks. Under David Hamdan's account number, entries indicated payments and the amount of Ayyash's debt. Next to the column of entries, Hamdi Ayyash had written the Arabic symbol for "Mussa," which means "Moses."
 
 
 16
 On October 22, 1991, Moses drove De La Cruz and Jamal Hamdan to the airport for another trip to Houston. However, as in August, she did not transport any cocaine. She received a call from Jamal telling her in a low voice to take $1,000 from the dresser drawer in his hotel room and to leave town. On that day, David called Zaatrah to have another individual, "Alex," also known as Ali Mazeary, come to Houston to drive. An hour later, David canceled the request. That evening, Moses explained to Zaatrah that David and Jamal Hamdan had been arrested. The parties stipulated that on October 22, 1991, David and Jamal Hamdan were arrested in Houston in possession of kilogram quantities of cocaine. Upon returning to Chicago, De La Cruz called the supermarket. Moses arranged a meeting. When they met, Moses gave her $200 and told her that they would soon be back in business and that they would contact her.
 
 
 17
 Chandler testified that he first met Moses Hamdan in the summer of 1992. Between that time and Chandler's arrest on January 12, 1993, he met four times with Moses Hamdan alone and two additional times with Moses and Zaatrah together. On one occasion, after placing an order with Zaatrah, Chandler purchased a kilogram of cocaine from Moses Hamdan for $21,500. On another occasion, Moses gave him two kilograms of cocaine and one pound of marijuana instead of one kilogram of cocaine and two pounds of marijuana. Upon discovering this error, he called Zaatrah and then went to meet Moses, who provided the correct amounts. Chandler also met with David Hamdan eight times.
 
 
 18
 This Court will uphold a verdict if " 'after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " United States v. Saulter, 60 F.3d 270, 274-275 (7th Cir.1995) (quoting Jackson v. Virginia, 443 U.S. 307, 319 (emphasis original)); United States v. Henderson, 58 F.3d 1145, 1148 (7th Cir.1995). Moses Hamdan does not argue on appeal that if the witnesses' testimony is accepted as credible, no rational trier of fact could have found all of the essential elements. Instead, he only attacks the witnesses' credibility. "We will not reevaluate the credibility of testimony even if it is 'totally uncorroborated and comes from an admitted liar, convicted felon, large scale drug dealing, paid government informant.' " Saulter, 60 F.3d at 275 (quoting United States v. Wilson, 31 F.3d 510, 513 (7th Cir.1994)). A conviction may rest solely upon the uncorroborated testimony of a co-conspirator unless that co-conspirator's testimony is incredible as a matter of law. See Henderson, 58 F.3d at 1149 (noting that verdict based solely on uncorroborated testimony of accomplice may provide sufficient evidence unless that testimony is incredible as matter of law); United States v. Van Whye, 965 F.2d 528, 531 (7th Cir.1992) (same). For testimony to be incredible as a matter of law, the defendant must show that it "would have been 'physically impossible for the witness to observe that which he claims occurred, or impossible under the laws of nature for the occurrence to have taken place at all.' " Saulter, 60 F.3d at 275 (quoting United States v. Wallace, 32 F.3d 1171, 1173 (7th Cir.1994)) (internal quotation marks omitted).
 
 
 19
 The defendant claims that the extreme untrustworthiness of the four witnesses distinguishes his case from ordinary cases involving allegedly incredible witnesses. We disagree. His attacks on their credibility fall into five categories: (1) prior lies out-of-court by certain witnesses, (2) the failure of certain witnesses to mention any participation by defendant in earlier statements made to DEA agents and, in one case, to a grand jury, (3) the failure of certain witnesses to attempt to call defendant in order to elicit incriminating statements as they had with other individuals, (4) inconsistent or unbelievable statements made during trial, and (5) favorable agreements with the government in exchange for their cooperation.
 
 
 20
 De La Cruz and Zaatrah lied to DEA agents during their initial interviews. After denying ever using the truck to transport drugs from Houston to Chicago, De La Cruz immediately concocted a story about helping a friend with car trouble after the agents told her that she had left fingerprints behind. Zaatrah lied at least fifteen times during his initial interview. However, the fact that the witness is an admitted liar is not sufficient to reject his in-court testimony. Saulter, 60 F.3d at 275 (witness admitted he would lie when it served his purposes); United States v. Marin, 7 F.3d 679, 688 (7th Cir.1993) (witness had admitted to prior perjury).
 
 
 21
 The defendant also points out that De La Cruz and Chandler did not mention either him or, in De La Cruz's case, David Hamdan's connection to Moe's Supermarket. In addition, Chandler also failed to include the defendant in a long list of his sources at the grand jury hearing. Moses Hamdan contends that these omissions constitute strong evidence that the witnesses fabricated their subsequent testimony. However, even assuming that the defendants had affirmatively denied Moses Hamdan's participation under oath, if the prior inconsistent statement has been presented to the jury, it is the jury's prerogative to choose to believe the witness' subsequent statements so long as they are not incredible as a matter of law. See Saulter, 60 F.3d at 275; cf. also United States v. Hatchett, 31 F.3d 1411, 1417 (7th Cir.1994) (holding that failure to mention fact in prior affidavit to support search warrant did not render officer's testimony incredible because he was not required to specify every detail).
 
 
 22
 Using a similar theory of impeachment by omission, Moses Hamdan contends that the absence of an attempt by Ayyash, Zaatrah and (although not mentioned on appeal) Chandler to call him in hopes of eliciting incriminating statements for the DEA agents shows that he was not a drug dealer.[1] He argues that they later made up their stories about his involvement to obtain favorable treatment from the government. However, Agent Krieg testified that the agents, not the cooperating individuals, chose the targets of these calls. They decided not to ask the witnesses to contact the defendant because they believed that he was aware that the cooperating individuals had been arrested and that he might even act in retribution if he suspected a trap. The jury received all of this information, including an explanation that does not fly in the fact of reality. We see no reason to disturb its credibility determination on these grounds.
 
 
 23
 Moses Hamdan also points to inconsistencies in the witnesses' testimony during trial. For example, De La Cruz initially testified that she had decided to stop lying to the DEA agents during the night between her first and second interviews. After defense counsel pointed out that she had not been completely truthful the next day, she stated she had decided to tell the truth, but not that particular night. Zaatrah made the remarkable statement that he was unaware that not committing crimes was a condition of his bond release for his October 1990 marijuana charge.[2] However, inconsistencies in a witness' testimony concerning peripheral matters do not render all of the witness' statements legally incredible. United States v. Wilson, 31 F.3d 510, 514 (7th Cir.1994) (holding that tangential inconsistencies within witness' testimony did not render that testimony incredible as a matter of law).
 
 
 24
 Moses Hamdan also contends that the allegations of poverty by Chandler, Ayyash and Zaatrah are simply incredible. For example, Ayyash agreed that by a rough estimate he had made between one and one and a half million dollars over the course of five or six years. When pressed during cross-examination for an accounting of his lost fortune, he provided a vague explanation.[3] The defendant also finds Zaatrah's testimony inconsistent. Even though he said that he was a partner, Zaatrah, who admitted to not paying some of his bills, testified that he purposely decided to draw only $400 or $500 a week. He said that he simply chose not to pay the bills. He also explained that he drew off only a small share of profits because he wanted to preserve capital for future investments. Their explanations, although perhaps suspicious, do not rise to the level of being incredible as a matter of law.
 
 
 25
 Finally, the favorable bargains struck by these witnesses with the government do not render their testimony incredible, even in conjunction with other alleged bases for finding the testimony incredible. Saulter, 60 F.3d at 275. In addition, defense counsel brought to the jury's attention the fact that none of the witnesses had been prosecuted for failing to pay taxes on the income generated by their illegal activities, or, in Ayyash's case, for hiring an arsonist. However, the witnesses also testified that they had neither been promised nor expected leniency in these other matters in exchange for their testimony.
 
 
 26
 These witnesses were not so untrustworthy that their testimony could not support the verdict. Aspects of their testimony were corroborated by other evidence, including hotel and telephone records. The defendant's claim of untrustworthiness lacks merit.
 
 
 27
 The defendant's conviction is affirmed.
 
 
 
 [1]
 The defendant also claims that the absence of his code number "007" in Hamdi Ayyash's books shows that no such account existed. However, the Arabic symbol for "Moses" appears beside David Hamdan's "888" account in the code book. Ayyash testified that he only kept records for a few weeks before destroying them and that sometimes, when in a hurry, he used name or symbol instead of a code number
 
 
 [2]
 We note that the defendant erroneously asserts that Hamdi Ayyash admitted that he could not even spell Moses' last name. In fact, Ayyash testified that on the day before Mahmoud Ayyash and others flew to Houston, Moses asked him how to spell his last name. He explained that he had never shown Moses an ID with his name on it and that there are often a variety of spellings for Arabian names with the same pronunciation. He also testified that he purposely misspelled his name by one letter. Interestingly, the passenger list for Mahmoud Ayyash's flight shows three seat reservations under the name "Ayaish."
 
 
 [3]
 Ayyash stated that of the $1-1.5 million, the government had seized $300,000 during his arrest, and that he had $500,000 "in the street" at that time. He stated that he had expended $400,000 in establishing a heroin connection (a sum which he had previously estimated as $30,000). He also stated that the "government took $400,000," although this statement may refer to the $300,000 seizure. Finally, he said that he had spent a great deal