**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Dan D. LASHMETT, Defendant–
Appellant.**

**No. 91–1317.**

United States Court of Appeals,
Seventh Circuit.

Argued Jan. 23, 1992.

Decided May 22, 1992.

Rodger A. Heaton (argued), Patrick Kelley, Asst. U.S. Attys., Springfield, Ill., for plaintiff-appellee.

Donald M. Shawler (argued), Marshall, Ill., for defendant-appellant.

Before COFFEY, FLAUM and RIPPLE, Circuit Judges.

FLAUM, Circuit Judge.

In the spring of 1985, Dan Lashmett (Lashmett) devised a scheme to secure insurance on fictitious livestock, report that fictitious livestock stolen, and collect on the insurance. One obstacle stood in his way: he was in state prison at the time (on charges unrelated to this suit), so he had to enlist the services of others to do the legwork for him. For that he turned to his son, Dan Jeffrey Lashmett (Jeff), and his son-in-law, Randy Smith (Randy), who together managed the family farming operation in Winchester, Illinois.

Lashmett administered the scheme from prison through a series of collect telephone calls to Jeff and Randy. Pursuant to Lashmett's instructions, they secured insurance on 382 non-existent feeder pigs with a market value of $24,830, and then obtained weight receipts for the fictitious pigs to provide documentary evidence of the pigs' existence. This last step was a little tricky because Jeff and Randy obviously did not own that many feeder pigs; they did, however, own enough of them to fill the back of a pickup truck, so they made several trips to the Winchester Farmers' Elevator carrying the same load of pigs, each time shuffling the pigs around and varying the number carried, to give the appearance that different pigs were being weighed. This gimmick produced weight receipts for $20,800 worth of pigs.

Lashmett next sent Jeff and Randy a $22,800 check (a stolen check, it turned out) on the account of one Frank Rossi. Lashmett instructed Jeff and Randy to tell the police that they sold 382 feeder pigs to a man named Frank Rossi, and that his check bounced, leaving them out the money and the pigs. Jeff and Randy put the plan into action, depositing the rubber check and reporting the (feigned) theft to police. Randy filed a claim with the insurance company which, apparently suspecting fraud, denied the claim. Lashmett directed his confederates to file a lawsuit against the insurance company, so they hired attorney David Leefers (Leefers) of Jacksonville, Illinois, on a one-third contingent fee basis.

Leefers filed suit in state court on Jeff and Randy's behalf and eventually prevailed against the insurer on a motion for summary judgment. (As will later become important, Leefers attached to this motion sworn affidavits from Jeff and Randy attesting to their ownership of, and the subsequent theft of, the pigs.) In the mean-

time, Lashmett had been released from prison, and in late March 1986, he accompanied Jeff and Randy to Leefers' office to pick up the proceeds from the lawsuit. Leefers gave them a check for $15,022.43, which represented the $22,800 judgment less legal expenses. Jeff cashed this check several days later, and at Lashmett's direction, took out $6,022, split that sum with Randy, and with the balance obtained two cashiers checks, one for $1,500 and one for $7,500. Lashmett gave the $1,500 check to his daughter, Julie Fearneyhough, to repay a loan, and the $7,500 check to his son, Terry Lashmett, who cashed it for his father.

A few weeks later, the postal service began an investigation; a postal inspector interviewed Lashmett, who claimed that he had never met Leefers and denied that he ever gave his daughter or son a cashier's check. Following the investigation, a grand jury returned an indictment against Dan Lashmett, Jeff Lashmett, and Randy Smith for mail fraud and aiding and abetting, 18 U.S.C. §§ 1341 & 2, and conspiracy to commit mail fraud. 18 U.S.C. § 371. Jeff and Randy pled guilty to reduced charges and served as the government's principal witnesses against Lashmett at trial. A jury found Lashmett guilty of five counts of mail fraud and one count of conspiracy to commit mail fraud. The district court sentenced him to 20 years imprisonment and ordered him to pay $22,800 in restitution to the defrauded insurer. Lashmett appeals both his conviction and sentence. We affirm the conviction, but vacate the restitution order and remand for resentencing.

## I.

In challenging his conviction, Lashmett argues the district court made four erroneous evidentiary rulings which together substantially prejudiced his defense. We review evidentiary rulings for abuse of discretion, *United States v. Briscoe*, 896 F.2d 1476, 1490 (7th Cir.), *cert. denied*, — U.S. ——, 111 S.Ct. 173, 112 L.Ed.2d 137 (1990), subject to a harmless error analysis. *Unit-*

*ed States v. Hogan*, 886 F.2d 1497, 1512 (7th Cir.1989).

## A.

■ Lashmett first argues that the court wrongly prohibited him from introducing prior inconsistent statements made by Jeff and Randy in their civil suit against the insurance company. *See Smith v. American Nat'l Fire Ins. Co.*, No. 85–L–59 (Ill. Cir.Ct. filed Jan. 23, 1986). The purported inconsistency is this: Jeff and Randy attested in state court, via their complaint and sworn affidavits, to the ownership and theft of 382 feeder pigs, yet they testified at Lashmett's trial that they never owned 382 feeder pigs and that a theft never occurred. Specifically, Jeff and Randy testified on direct examination that they concocted the story about the stolen feeder pigs and that they filed a state lawsuit based on that false story. (In other words, they admitted not only that the complaint and affidavits were prior inconsistent statements but that they were absolute lies.) Lashmett returned to this issue on cross-examination, asking Jeff and Randy about their actions in filing the lawsuit and specifically, about their prior inconsistent statements. But the court cut short Lashmett's inquiry into the matter and refused to permit extrinsic proof of the statements. It viewed the statements as consistent because the complaint and affidavits were admittedly false documents. Consequently, the court apparently saw no impeachment value to admitting the complaint and affidavits into evidence. *See* Tr. at 47–48 (complaint), 65–67 (affidavits), 143 (affidavits).

Lashmett contends that the district court erred by not permitting introduction of this documentary evidence (the complaint and affidavits) for impeachment purposes and for its truthfulness. Federal Rule of Evidence 613(b) permits impeachment of witnesses with prior inconsistent statements and Federal Rule of Evidence 801(d)(1)(A) provides that such statements may also be introduced for their truthfulness if they were given under oath in a prior legal proceeding. Both Rules permit extrinsic

proof of the inconsistency—as long as the declarant is given an opportunity to "explain or deny" the inconsistent statement under Rule 613(b), and as long as the declarant is available for cross-examination under Rule 801(d)(1)—and thus Lashmett sought to introduce the complaint and affidavits into evidence to give the jury an actual look at the inconsistent statements.

The precise issue, then, is as follows: if a witness admits to making a prior inconsistent statement (or lie), is the adverse party still entitled to introduce extrinsic evidence to emphasize the fact that the witness made the prior statement? Lashmett answers yes, the government answers no, and authorities go both ways. Some courts have held that extrinsic evidence should *not* be allowed in such circumstances, because a witness who admits to having uttered a prior inconsistent statement has, by definition, been impeached, rendering extrinsic evidence superfluous. *See, e.g., United States v. Soundingsides,* 820 F.2d 1232, 1240–41 (10th Cir.1987) (finding no rational basis for introducing a prior inconsistent statement if the witness admits making it); *United States v. Cline,* 570 F.2d 731, 735 (8th Cir.1978) (same); *see also McCormick on Evidence,* § 37, at 79 (Edward W. Cleary ed., 3d ed. 1984) ("prevailing view" holds that if the witness "unequivocally admits" making the prior statement, the cross-examiner may not introduce extrinsic evidence). Other courts have held that extrinsic evidence should be permitted, because it is generally more persuasive to a jury than a witnesses' simple acknowledgement that he or she made the false or inconsistent statement. *See, e.g., Williams v. United States,* 403 F.2d 176, 179 (D.C.Cir.1968) (error to exclude written prior inconsistent statement even though witness admits making it); *United States v. Browne,* 313 F.2d 197, 199 (2d Cir.), *cert. denied,* 374 U.S. 814, 83 S.Ct. 1707, 10 L.Ed.2d 1037 (1963) (same); *see also* 3 David W. Louisell & Christopher B. Mueller, *Federal Evidence* § 358, at 564 (1977) (arguing Rule 613 should be read broadly to permit extrinsic proof of a prior inconsistent statement even if the witness admits to making it); 3A *Wigmore on Evidence* § 1037, at 1044–45 (James H. Chadbourn ed., 1970) (same).

The Supreme Court, in a slightly different context, expressed support for the latter view, noting that a declarant's "admission that a contradiction is contained in a writing should not bar admission of the document itself into evidence ... because it will emphasize the contradiction to the jury [and] best inform them as to the document's impeaching weight and significance." *Gordon v. United States,* 344 U.S. 414, 420–21, 73 S.Ct. 369, 374, 97 L.Ed. 447 (1953). As one commentator observed, "[a] party should be allowed to make his case by the most convincing evidence he can obtain ... and extrinsic proof of a prior statement will often be far more convincing than the acknowledgment of the declarant, and not cumulative." 3 *Federal Evidence, supra,* § 358, at 564 (citing *Gordon* with approval). We agree. Prior inconsistent statements can severely undermine the credibility of a witness, by showing either a flimsy recollection of events or worse, a propensity to lie, and we think the better view is to give Rule 613(b) a broad reading. Notwithstanding that conclusion, we find that the ruling here was harmless error.

■ Lashmett's objective in getting the complaint and affidavits before the jury was to give them a concrete look at Jeff and Randy's deceit and to reinforce the notion that if they lied once in court, they might well be lying again. We think that objective was met in this case. The jury was fully apprised of Jeff and Randy's hoax in filing a sham lawsuit, not to mention their history of such behavior (both had prior convictions for crimes of dishonesty, *see infra* Section I.B). The jurors were shown Jeff and Randy's plea agreements, which related details of the scheme and the lies to police, to the insurance company, to attorney Leefers, and in state court, Gov't. Ex. 14 and 15, they heard Jeff and Randy admit on direct examination that the state suit was all a lie, Tr. at 20–22, 25, 112, 125, and they heard similar, albeit limited, admissions on cross-examination (including reference to their sworn admissions in the affidavits). Tr. at 46, 49–

60, 62–65, 67, 143–45. In fact, the jury did eventually see one of the two pieces of extrinsic evidence Lashmett sought to introduce—the sworn affidavits—which were introduced later in the trial when Leefers took the stand and testified to filing the lawsuit on Jeff and Randy's behalf. Tr. at 167; Def. Ex. 2. Accordingly, we conclude that the error in excluding this extrinsic evidence was harmless.

■ As to Lashmett's other contention, that he should have been able to introduce this evidence for its truthfulness, Fed. R.Evid. 801(d)(1)(A); *see, e.g., United States v. Manos*, 848 F.2d 1427, 1432 (7th Cir.1988), we also find this exclusion to be harmless error. Lashmett maintains that he was entitled to argue to the jury that Jeff and Randy actually *did* own 382 feeder pigs which were stolen, and that they were now lying about lying. Technically, Lashmett is correct; this evidence meets the strictures of Rule 801(d)(1)(A)—it was given under oath in a prior legal proceeding—and should have been admitted for its truthfulness. While the jury was entitled under Rule 801 to accept this argument— and nothing really prevented them from accepting it—it strains credulity to imagine that any rational juror would actually do so. To accept this argument is to accept that no fraudulent scheme ever existed in spite of overwhelming evidence that one did. We can envision a rational juror surmising that Jeff and Randy were the real culprits in this scheme who now sought to pin the blame on Lashmett. But we cannot envision a rational juror actually believing that Jeff and Randy owned 382 insured feeder pigs, had them stolen, concocted a story about an insurance fraud scheme, and later pled guilty to committing that non-existent fraud scheme.

## B.

■ Lashmett next contends that the district court erred in prohibiting him from eliciting opinion testimony on the allegedly dishonest character of Jeff and Randy. Lashmett's two daughters, Julie Fearneyhough and Amy Davidson, were apparently prepared to testify to that effect. On direct examination, Lashmett asked each for her opinion as to whether Randy and Jeff were dishonest people. The government objected on both occasions and the court sustained the objections. The government concedes that the district court (and it) erred, but contends that the errors were harmless.

As a general matter, the credibility of a witness may be attacked by opinion or reputation evidence, although the inquiry is strictly limited to the witnesses' character for veracity. Fed.R.Evid. 405(a) and 608(a); *see, e.g., Manos*, 848 F.2d at 1431. Although the court allowed Fearneyhough and Davidson to offer reputation testimony—both testified that Jeff and Randy had reputations in the community for dishonesty—it erroneously refused to let them go one step further and add their personal opinions on the matter. We conclude this was harmless error. The added impact from allowing Fearneyhough and Davidson add that they, too, thought that Jeff and Randy were scoundrels would have been incremental at best.

■ The sole objective behind permitting this sort of evidence is to give juries a gauge for weighing testimony. That objective was achieved here even without the proffered opinion testimony. The jury undoubtedly got the message that Jeff and Randy were not paragons of virtue: both confessed on the stand or in a plea agreement that they lied to the police, to the insurance company, to Leefers, and in sworn affidavits submitted in state court, and both admitted that they had prior convictions for crimes of dishonesty, Randy for misdemeanor deceptive practices, and Randy and Jeff for defrauding the federal government on farm loans. On this record, Jeff and Randy had highly questionable characters for veracity from the start and the excluded opinion evidence would not have added much, if anything, to that perception.

## C.

■ Lashmett further maintains that the district court improperly prevented him

from buttressing his attack on Randy Smith's credibility by introducing evidence of a specific act of dishonesty. Federal Rule of Evidence 608(b) permits such impeachment, subject to the restriction that no extrinsic evidence may be introduced to prove the act of dishonesty; in other words, only cross-examination may be employed in attempting to expose dishonest acts.

Here, Rule 608(b) came into play when Lashmett asked Randy on cross-examination if he got along well with Jeff. Randy replied that, aside from routine family quarrels, he and Jeff got along fine. Lashmett then sought to impeach Randy by asking him if Jeff had ever accused him (Randy) of forging his name on a check. The government objected and the district court sustained the objection. On appeal, Lashmett argues this alleged act of forgery bore directly on Randy's character for truthfulness, *see, e.g., United States v. Covelli,* 738 F.2d 847, 856 (7th Cir.) (evidence that defendant had once faked insanity to dodge a burglary charge admissible under Rule 608(b)), *cert. denied,* 469 U.S. 867, 105 S.Ct. 211, 83 L.Ed.2d 141 (1984), and that he should have been permitted to pursue this line of questioning under Rule 608(b).

The district court sustained the objection, apparently after deciding that the question, as framed, did not meet the requirements of Rule 608(b). That rule expressly grants the trial judge discretion in deciding whether to permit introduction of specific acts of dishonesty and we find that the court acted within that discretion here. The court determined that Lashmett's inquiry needed to be more specific because, as formulated, it was directed at a family quarrel and an accusation of forgery, rather than an actual act of dishonesty. *Cf. United States v. Kirk,* 496 F.2d 947, 949 (8th Cir.1974) (indictment, unlike a conviction, is a mere accusation of wrongdoing and thus not a proper source of impeachment). Lashmett did not attempt to reframe the question to meet that concern and, under the circumstances, we find no abuse of discretion.

## D.

■ Lashmett's final evidentiary challenge regards the district court's decision to allow the jury to learn of his incarceration. Lashmett had no objection to the government introducing evidence that he telephoned his co-conspirators while away from home but did object to any evidence informing the jury that he did so from prison. That evidence, he maintains, had the unavoidable and unfairly prejudicial consequence of informing the jury that he had been convicted of some crime in the past. Prior bad acts may not, of course, be admitted to show propensity to commit the criminal act charged, but may be admitted for other purposes, such as proof of motive or opportunity to commit the crime alleged. Fed.R.Evid. 404(b). When so used, the court must still engage in a balancing test to ensure that the probative value of the evidence is not outweighed by its prejudicial effect. Fed.R.Evid. 403.

Here, the government presented a motion *in limine,* requesting permission to introduce evidence of Lashmett's incarceration. The government argued this evidence showed Lashmett's motive for employing others to execute the insurance scheme on his behalf and filled a gap in the case by explaining his absence. After engaging in the requisite Rule 403 balancing test, the court granted the government's motion, finding it proper motive and opportunity evidence, a decision it reaffirmed in ruling on Lashmett's motion for a new trial.

Lashmett argued then, as now, that this evidence failed to show his motive or opportunity to commit the crime; if his incarceration was his only motive for recruiting others to execute the scheme, he argues, then those recruits would presumably have dropped from the scheme after his release from prison. To the contrary, Lashmett points out, both co-conspirators stuck it out until the end. We find little merit in this argument. His cohorts' continued participation after Lashmett's release from prison does not negate his original motivation for recruiting them, but only raises the question why they stayed involved after his release. That question is irrelevant to his

initial motivation. (Although it is a question with a number of easy answers, such as staying involved to ensure they got a share of the proceeds, or because they had become indispensable—as the claimants/plaintiffs—to the scheme's consummation.)

Moreover, evidence of Lashmett's incarceration filled a "chronological and conceptual void" in the government's case, *see United States v. Hattaway*, 740 F.2d 1419, 1425 (7th Cir.), *cert. denied*, 469 U.S. 1028, 105 S.Ct. 448, 83 L.Ed.2d 373 (1984), and it provided the backdrop against which the alleged scheme was carried out. *United States v. Mancari*, 875 F.2d 103, 105 (7th Cir.1989) ("The onset of a course of dealings is admissible to enable the jury to grasp the context in which the specific transactions charged as being criminal occurred."); *accord United States v. Currier*, 821 F.2d 52, 55 (1st Cir.1987) ("evidence of prior [bad act] admissible to complete the story of a crime by proving the immediate context of events near in time and place."). In *United States v. Champion*, 813 F.2d 1154 (11th Cir.1987), for example, one of the defendants was incarcerated during a portion of a drug conspiracy and allegedly administered the scheme by telephone from prison. The court admitted evidence of the defendant's incarceration under Rule 404(b)

> because it was linked together in time and circumstances with the conspiracy charged and was necessary to make the crime comprehensible to a jury. If the government had been prevented from presenting evidence as to [the defendant's] incarceration, the jury might have accorded undue weight to the fact that [the defendant] was not physically present [during much of the scheme].

*Id.* at 1172–73. Similarly, Lashmett's incarceration was linked in time and circumstances with the fraudulent scheme and it filled a chronological gap in the case.

■ We also disagree with Lashmett's contention that this evidence was highly prejudicial and outweighed any probative impact. He argues the jury could have understood the government's theory just as easily if Jeff and Randy had been limited to testifying that Lashmett administered the scheme by telephone because he lived away from home at the inception of the scheme. We find that the district court also acted within its discretion in concluding that the probative value of this evidence outweighed its potential prejudice under Rule 403. Its prejudicial effect at trial was limited; the government did not focus on this evidence, or in any way call attention to it—indeed, it was barely mentioned at trial—and the jury was never given the reason for Lashmett's incarceration or other information concerning his extensive criminal background. Moreover, the court gave a cautionary instruction, telling the jury that they were to consider this evidence only on questions of motive and opportunity, and not to infer guilt for the crimes charged.

## II.

■ As for sentencing, Lashmett argues that the district court erred in imposing restitution without considering his ability to pay such a judgment. Lashmett failed to object to this issue at sentencing so we review it for plain error. Fed.R.Crim.P. 52(b); *United States v. Gomer*, 764 F.2d 1221, 1223–25 (7th Cir.1985).

The Victim and Witness Protection Act of 1982 requires courts to consider a defendant's financial status before imposing restitution. 18 U.S.C. §§ 3579–80.[1] Specifically, § 3580(a) states that the district court *shall* consider the financial resources, financial needs, and earning ability of the defendant in determining the appropriate order of restitution. *See United States v. Peden*, 872 F.2d 1303, 1311 (7th Cir.1989) (consideration of defendant's finances a mandatory prerequisite to imposing restitution); *see also United States v. Arvanitis*, 902 F.2d 489, 496 (7th Cir.1990).

The record is devoid of any mention of Lashmett's financial status, by the government or by Lashmett, and it does not appear that the court had occasion to consider

---

1. Subsequently recodified to 18 U.S.C. §§ 3663–64 by the Sentencing Reform Act of 1984.

it. This constitutes plain error, *Gomer*, 764 F.2d at 1223, and accordingly, we vacate the restitution order, and remand for resentencing. Though we were unaided by the government's unusually sparse brief in this case, we do commend the government for its candor in conceding Lashmett's restitution argument.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.