In the

# United States Court of Appeals

## For the Seventh Circuit

No. 16-2269

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

JAIME C. LOPEZ,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Southern District of Indiana, Indianapolis Division.
No. 1:15-cr-00069-TWP-DML-1 — **Tanya Walton Pratt**, *Judge.*

ARGUED JUNE 1, 2017 — DECIDED AUGUST 29, 2017

Before BAUER, POSNER, and HAMILTON, *Circuit Judges*.

BAUER, *Circuit Judge.* A jury convicted Jaime Lopez of fifteen counts of wire fraud, four counts of money laundering, and one count of securities fraud in connection with his participation in a fraudulent investment scheme. Lopez challenges his conviction based on various evidentiary rulings that he argues deprived him of a fair trial. We affirm.

## I.  BACKGROUND

In 2009, Lopez, a self-described financial advisor, began creating financial investment business entities and soliciting startup capital from family and friends. These entities were named JCL Interest Plus, JCL Capital Inc., JCL & Company, and JCL Direct. Between December 2009 and January 2011, Lopez received approximately $450,000 total from Thomas Holsworth, Jerry Wilson, Colleen Wilson, and Danny Cole. Aside from Lopez's father-in-law, these were the only four individuals who invested with Lopez.

Lopez directed those four individuals to transfer their retirement funds from their personal accounts into self-directed individual retirement accounts administered by a company called Entrust IRA, later known as Midland IRA. Lopez told them that he would then move the funds from the Midland IRAs into one or more of the JCL entities for further investment. Each of the individuals executed promissory notes, providing for various rates of return at various maturity dates. Through personal conversations, brochures, and his company's website, Lopez told his investors that he intended to secure their returns through investments in companies such as Coca-Cola, ExxonMobil, Wells Fargo, Visa, American Express, and Procter & Gamble. The documents the investors signed, however, did not specify particular investments that would be made and reserved Lopez's discretion to invest where he saw fit.

Each of the investors transferred their funds to Midland IRA, per Lopez's instruction, and Lopez then deposited the funds into various bank accounts that he controlled under the

names of the various JCL entities. None of that money, however, was ever invested in any of the companies Lopez listed in his advertising materials. Lopez used $45,000 of Danny Cole's money to open an E*Trade stock-trading account, but eventually lost all of that money. The remainder of the investors' capital either remained in the JCL bank accounts or was placed into an account under the name 413 Solutions, Inc.—Lopez's wife's management consulting business, which she ran out of their family home.

Lopez used a significant portion of these funds to pay for personal expenses including $70,574 in home mortgage payments; $41,208 on automobiles; and $45,870 on landscaping for his home. Some of those payments were made with checks from the JCL entities' accounts, while some of them were paid out of the 413 Solutions, Inc. account. It was Lopez's theory at trial that these amounts were business expenses for his wife's company and that the funds in the 413 Solutions, Inc. account were investments made with a return expected at a later date. The government's theory was that Lopez was simply using the investors' capital to pay for his lifestyle.

Between mid-2011 and early 2012, Lopez unilaterally changed the terms of each investors' promissory note. At trial, each of the investors testified that they were not aware of these changes, did not give Lopez permission to make them, and did not sign any documents authorizing them. In each case, Lopez made the investment term longer and the rate of return lower than what the investors agreed to in the original notes.

In early 2013, after confronting Lopez about the use of his investments, Danny Cole complained to the Indiana Secretary

of State Securities Division, and the Internal Revenue Service eventually began investigating Lopez's businesses. On January 13, 2016, the government filed a superseding indictment charging Lopez with fifteen counts of wire fraud, in violation of 18 U.S.C. § 1343; four counts of money laundering, in violation of 18 U.S.C. § 1957; and one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 77ff(a). On March 14, 2016, a jury found Lopez guilty on all counts. He timely appealed.

## II. DISCUSSION

Lopez raises four issues on appeal, each of which, he argues, constitutes grounds for a new trial. First, he argues that the district court erred in allowing a government witness to testify that payments Lopez made to his investors were "lulling payments." Second, Lopez contends that the government's references to Bernie Madoff in its closing argument denied him a fair trial. Third, he argues that the court erred in denying his request to label his witness, Michael Aldering, an "expert" in front of the jury. Finally, Lopez contends that the court improperly prevented him from introducing extrinsic evidence of a prior inconsistent statement by a government witness. We address each argument in turn.

### A. Use of the Term "Lulling Payments"

The government called IRS Agent Janet DeLancey to testify as a summary witness regarding the investigative efforts to trace money through Lopez's accounts. At various points in her testimony, over Lopez's objection, Agent DeLancey used the term "lulling payments" to refer to money that Lopez periodically paid back to his investors. According to Agent

DeLancey, Lopez led the investors to believe that these payments were derived from interest earned on investments he made with their money when, in fact, he simply used other investors' principal funds to make those payments.

Lopez argues that Agent DeLancey's testimony regarding "lulling payments" allowed her to draw conclusions and express opinions about Lopez's intent that fell outside the permissible scope of her testimony as a summary witness. We review a district court's decision to admit or exclude evidence for an abuse of discretion. *United States v. Causey*, 748 F.3d 310, 315–316 (7th Cir. 2014) (citation omitted).

Contrary to Lopez's contention, Agent DeLancey did not offer any improper opinions or conclusions with her use of the term "lulling payments." She first used the term in response to a direct-examination question on how Lopez used the funds he received from investors:

> A portion of those funds, a significant portion, was also used to make payments back to [the investors' accounts at] Midland, what I refer to as those are lulling payments, because the records show instead of using the funds, investing them in a third party as he represented to Mr. Cole and Mr. Holsworth and the Wilsons, those funds actually would go into like the JCL account. And they would sit there, and then they would just be used to pay back to Midland to make the interest payments.

At this point, Lopez objected to the use of the term "lulling payments" and was overruled. Throughout the remainder of

the direct examination, Agent DeLancey continued to reference "lulling payments" as she summarized the bank account exhibits that the government entered into evidence.

At no time, however, did she offer any testimony or opinion as to why Lopez made those payments. She did not, and was not asked to, testify as to the intent behind those payments or the effect they might have had on the investors. She simply used the term to describe payments that appeared to be derived from interest on investments, when, in fact, they were derived from other investors' capital. This was information that she gathered from her review of the documents she was called to summarize, and is appropriate testimony for a summary witness to offer. *See United States v. Pree*, 408 F.3d 855, 869 (7th Cir. 2005) ("It is well established that the nature of a summary witness' testimony requires that he draw conclusions from the evidence presented at trial." (citation, quotation marks, and alteration omitted)).

In addition, Lopez's argument loses some of its force in light of the fact that his counsel cross-examined Agent DeLancey on her characterization of the payments as "lulling payments." He contends that the court denied him a full opportunity to address this issue on cross, but we are not persuaded by that argument after reviewing the transcript. In his brief, Lopez states that he sought to establish that the "lulling payments" to which Agent DeLancey referred were payments he was required to make by the terms of the investor agreements, but that the court did not allow him to do so. The following exchange belies that contention:

Q: Now, in your testimony, you referred to payments to the lenders as lulling payments; is that right?

A: Yes.

Q: But the terms of this agreement actually require Mr. Lopez to make payments on a monthly basis to Ms. Wilson of $210; is that right?

A: Yes.

Q: So when you refer to some of these as lulling payments, you're actually referring to payments that Mr. Lopez made to lenders per these written contracts?

A: Right. When I refer to them as lulling payments, I'm referring to the fact that those are just the investor's funds that are being used to pay back—to make the payments that he's required to make as interest payments, but—

Q: But they are payments that Mr. Lopez was required to make to the lender by these contracts?

A: Yes, that JCL Direct is required to make, yes.

Q: So he was adhering to the terms of this contract when he was making those payments to Mrs. Wilson?

A: Yes.

Lopez contends that subsequent government objections caused confusion and cut short his ability to make his point to the jury. But, as the above exchange demonstrates, it is simply not true that Lopez's counsel was not permitted to question Agent DeLancey's use of the term, nor that she failed to answer the question of whether Lopez was required to make regular payments under the terms of the contract.

Agent DeLancey did not offer any improper opinions or conclusions in association with her use of the term "lulling payments." Lopez was given ample opportunity to cross-examine Agent DeLancey, as well as make his arguments to the jury regarding the use and meaning of that term. Therefore, the district court did not abuse its discretion in allowing its use.

### B.  References to Bernie Madoff

Next, Lopez takes issue with references to Bernie Madoff that the government made during its closing argument. The first reference came when the government was discussing the payments Lopez made to Danny Cole. The government attorney stated: "The fact that through the gift of Jaime Lopez's father-in-law that [Cole] got money back doesn't mean he wasn't defrauded. I would suggest to you, you may know the Bernie Madoff case." At this point, Lopez's attorney objected and was overruled. The government continued, "Lots of people got money back through Bernie Madoff."

The second reference came during the discussion of Agent DeLancey's testimony regarding lulling payments: "These are not interest payments. … This is just lulling. It's, in the fraud scheme, it's a way of making sure you don't get caught. Just like, again, Bernie Madoff paid people for 15, 20 years or more,

hundreds of thousands of people–." Lopez's attorney then objected again and was overruled. The government finished its argument, referencing Madoff's victims: "They were getting lulling payments designed to keep this from being revealed, and that's exactly what these payments are."

Lopez argues that these references served only to inflame the passions of the jury and that because the comparisons between Lopez and Madoff were not justified by the evidence, he was denied a fair trial. The court's decision to overrule an objection to comments in a closing argument is reviewed for an abuse of discretion. *United States v. Richards*, 719 F.3d 746, 764 (7th Cir. 2013) (citation omitted). "As a general matter, improper comments during closing arguments rarely rise to the level of reversible error, and considerable discretion is entrusted to the district court to supervise the arguments of counsel." *United States v. McMath*, 559 F.3d 657, 667 (7th Cir. 2009) (citation and quotation marks omitted). We employ a two-part test, which is "difficult to satisfy," to determine whether a prosecutor's comments rise to the level of reversible error. *United States v. Bell*, 624 F.3d 803, 811 (7th Cir. 2010) (citation omitted). We first determine whether the comments are improper standing alone, and if they are, we then "consider the remarks in the context of the record as a whole and assess whether they denied the defendant his right to a fair trial." *Id.*

As an initial matter, we are not convinced that the references to Madoff were improper standing alone. The prosecutor did not make a direct comparison between Lopez and Madoff; he did not suggest that the two shared any personal traits or that the scope of Lopez's crimes was similar to that of Madoff's. Instead, as a way to demonstrate to the jury the purpose

of the payments Lopez made to his investors, the prosecutor made a specific and limited comparison to the lulling payments Madoff used to disguise his scheme.

We recognize, however, that even a passing reference to a criminal like Madoff has the potential to inflame the passions of a jury. So, if we assume that the comments were improper in isolation, we then consider them in the context of the entire record and determine whether they denied Lopez a fair trial. This prong of the analysis requires us to weigh the following factors: "(1) whether the prosecutor misstated the evidence; (2) whether the statements implicate a specific right of the defendant; (3) whether the defense invited the prosecutor's remarks; (4) the trial court's instructions; (5) the weight of the evidence against the defendant; and (6) the defendant's opportunity to rebut." *Richards*, 719 F.3d at 766.

Only two of these factors weigh in Lopez's favor. First, there is no contention that Lopez invited the Madoff comments. Second, the district court did not provide any instruction directly related to the comments because it ruled that they were proper in the context of closing argument. When considered against the other factors, however, neither of these is sufficient to establish that the comments constitute reversible error.

As to the first factor, by referencing Madoff, the prosecutor did not misstate the evidence. Through Agent DeLancey, the government demonstrated that Lopez's payments to investors were not interest payments, as he led them to believe. Thus, the analogy to Madoff's lulling payments was not an inaccurate one, based on DeLancey's testimony. As we noted, the prose-

cutor did not attempt to compare the scope of the two schemes and limited his reference to the similar use of lulling payments.

The second factor also weighs in favor of the government, as Lopez concedes that these comments did not implicate one of his specific trial rights. As to the sixth factor, Lopez clearly had an opportunity to rebut the government's argument, as the Madoff comments came in the first portion of the government's closing. Lopez submits that he did not rebut the argument because he did not want to "re-ring the bell" by mentioning Madoff again, but that is a matter of strategy, not opportunity.

Finally, and most importantly, the weight of the evidence against Lopez was overwhelming. *See United States v. Hale*, 448 F.3d 971, 986 (7th Cir. 2006) (noting that the weight of the evidence is the "most important[]" factor). The government's evidence showed that Lopez used the vast majority of the funds his investors gave him for personal expenses, including home mortgage payments, landscaping bills, and vehicle purchases. Lopez created new promissory notes, with less favorable terms than the original notes, without the investors' consent or knowledge. His advertising materials suggested that he planned to invest in companies such as Coca-Cola, ExxonMobil, Wells Fargo, Visa, American Express, and Procter & Gamble, but there was no evidence of any such investments. Moreover, as discussed above, Lopez led his investors to believe he was paying them back with interest on investments, when in fact he was simply using principal funds from other investors.

Clearly, there was significant evidence of Lopez's guilt, and when considered in combination with the other factors weighing in the government's favor, we cannot say that the prosecutor's two references to Madoff denied Lopez a fair trial. Therefore, we conclude that the district court did not abuse its discretion in overruling Lopez's objections.

## C. Alerding's Status as Expert Witness

Lopez's next argument concerns his witness Michael Alerding, a certified public accountant. Lopez submitted an expert report from Alerding, which the government sought to bar. The district court issued a written order holding that Alerding's proposed testimony, including his opinion testimony, was admissible. The same order, however, prohibited the parties from referring to Alerding as an "expert" during trial. Lopez argues this ruling constitutes reversible error.

We review *de novo* whether the district court correctly followed the procedures required by Federal Rule of Evidence 702, "but once we determine those procedures were followed, we review the decisions to admit or exclude expert testimony for an abuse of discretion only." *United States v. Glover*, 479 F.3d 511, 517 (7th Cir. 2007). We find no error in the court's analysis under Rule 702. The court's pretrial order on this issue applied the standards for Rule 702 set forth in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). Applying those standards, the court found that it was not appropriate to refer to Alerding as an "expert witness." As a practical matter, however, the court held that Alerding's proposed testimony

was admissible, and even stated that Lopez was permitted to refer to Alerding's testimony as "opinion testimony."

Because the court's order did not bar any of Alerding's opinions or proposed testimony, Lopez's only remaining argument can be that the court abused its discretion by prohibiting him from referring to Alerding as an "expert" in front of the jury. The court reasoned that such a label could confuse the jury and inappropriately elevate the status of Alerding's testimony in the jury's eyes. It also noted that this is the standard practice for all cases in that court and is the typical practice of other judges in that district.

We find no abuse of discretion in the court's reasoning. This is not a situation in which the court allowed the government to use the "expert witness" label, but refused Lopez that opportunity. There is a danger in every case that upon hearing the title "expert"—particularly if it comes from the court itself—a jury may assign inappropriate weight and credibility to that witness's testimony in comparison to that of others. To combat that danger, courts instruct juries, as the court did in this case, that witnesses who testify based on specialized knowledge are to be judged the same as any other witness. Precluding the use of the "expert" title is simply another safeguard against that danger.

However, even if the court erred in denying use of the "expert" label, it was harmless, given that the court allowed Lopez to establish Alerding's credentials and elicit his opinions in front of the jury. It is significant that Lopez cannot point to any evidence or testimony that the court's ruling prevented him from eliciting. He contends that the court's order created

"confusion among the parties as to the scope and limits of Alerding's testimony," which ultimately hindered his ability to fully elicit Alerding's opinions. Upon review, however, the order provides little room for any such confusion.

The court's order notes that Alerding's report contained two opinions: (1) that Lopez operated closely-held businesses and that the payment of personal expenses through those businesses is not atypical; and (2) that Lopez operated profitable businesses, in which he deposited investors' funds. The order then clearly states that Alerding's proposed testimony is admissible and permits the parties to refer to it as opinion testimony. There is nothing in the order to suggest that Alerding would be prevented from offering any opinions or proposed testimony, nor does Lopez contend that the court prevented him from doing so with any rulings at trial.[1] Thus, Lopez was free to elicit Alerding's opinions, and any confusion Lopez experienced cannot be attributed to an error or abuse of discretion by the court. Thus, there is no reversible error in the court's rulings regarding Alerding.

## D.  Danny Cole's Prior Inconsistent Statement

Lopez's final argument is that the district court committed reversible error when it declined to allow him to introduce extrinsic evidence of a prior inconsistent statement to impeach

---

[1] Lopez suggests that Alerding was prevented from offering an opinion on the future viability and profitability of Lopez's wife's business. However, while the court did not list this specific opinion in its order, the order explicitly deemed admissible Alerding's testimony without qualification. Moreover, there is nothing in the record to suggest that Lopez attempted to elicit this opinion at trial and was prevented from doing so.

government witness Danny Cole. We review a district court's decision to exclude evidence for an abuse of discretion. *Causey*, 748 F.3d at 315–316.

In 2014, Cole told IRS Agent Jimmy Shivers that the signature on his initial investment documents was not his own. Cole did not, however, tell Agent Shivers that he had given Lopez permission to sign Cole's name on those documents. That omission surfaced for the first time during his cross-examination by Lopez's counsel. During that exchange, Cole acknowledged that he led Agent Shivers to believe that Lopez had signed those documents without Cole's permission, which was not true.

The next day, Lopez's counsel sought to perfect Cole's impeachment by calling Agent Shivers to testify regarding Cole's prior inconsistent statement, *i.e.* his omission of the fact that he authorized Lopez to sign his name. The government objected, arguing that because Cole admitted to the omission on the witness stand the impeachment had been perfected, and the extrinsic evidence was therefore inadmissible. The court agreed, holding that Cole's admission meant there was no longer any inconsistency to attack through additional testimony from Agent Shivers.

As Lopez points out, we have held that, even when a witness admits to making a prior inconsistent statement, Federal Rule of Evidence 613(b) should be read broadly to allow a party "to introduce extrinsic evidence to emphasize the fact that the witness made the prior statement[.]" *United States v. Lashmett*, 965 F.2d 179, 182 (7th Cir. 1992); *see also United States v. Wimberly*, 60 F.3d 281, 286 (7th Cir. 1995) ("Prior

inconsistent statements are admissible even though the witness admits making the prior inconsistency." (citation omitted)). The district court erred, therefore, in denying Lopez's request to call Agent Shivers to highlight the inconsistency.

However, that decision is still subject to harmless error review and we will "only overturn a conviction on evidentiary grounds if the error had a substantial influence over the jury." *Wimberly*, 60 F.3d at 286 (citation and quotation marks omitted). The error in this case did not have a substantial influence on the jury. The inconsistency that Lopez intended to highlight was put on full display for the jury through repeated questions during his cross-examination of Cole, as well as during his closing argument, when he discussed Cole's inconsistencies at length. Additionally, the government's case did not rely on the statements that Cole made to Agent Shivers, nor was the inconsistency in those statements central to Lopez's defense. *See id.* at 286–87 (highlighting the government's reliance on the witness's statements and potential impairment to a theory of defense as considerations in harmless error analysis). The jury was made aware of the inconsistencies in Cole's version of events and was able to weigh his credibility accordingly. Therefore, we find the district court's error to be harmless.

### III.  CONCLUSION

For the foregoing reasons, the conviction is AFFIRMED.

POSNER, *Circuit Judge*, dissenting. The defendant, convicted by a jury of multiple violations of wire fraud and related financial offenses, see 15 U.S.C. §§ 78j(b), 78ff(a), and 18 U.S.C. §§ 1343, 1957, was sentenced to 57 months in prison to be followed by three years of supervised release, and to pay $293,171.84 in restitution. But because the district judge committed serious errors in the defendant's criminal trial, we should vacate the defendant's conviction and order a new trial.

He had started an investment company, called JCL & Company, Inc., in 2008. He claims that his business plan, put into effect at the beginning of the following year, was to borrow money from investors (a minimum of $25,000 per investor) and invest the borrowed money in businesses in the hope that the investments would yield sufficient profits to compensate the investors generously for lending money to his company, as well as yielding profits for himself.

His business plan began to falter in 2011; he failed to make the investments that he'd promised his investors—instead mostly putting money in his wife's consulting firm—and is accused by the government of having forged signatures on the promissory notes that he received from the investors, in particular one named Danny Cole. Cole told one of the government investigators that his apparent signature on one of the promissory notes was a fraud, because it omitted his middle initial—and he said he never omits his middle initial in writing his name. Yet at trial he testified without contradiction that he'd verbally authorized the defendant to sign the promissory note in question. It is not forgery to copy a person's name spelled *as dictated by the person*. Cole's omission of this crucial detail during the government's investigation suggests that Cole was at best not a reliable witness and, much worse, may have intentionally deceived the government into thinking that Lopez had committed more serious crimes than Lopez had committed. Despite the significance of Cole's omissions, the judge un-

accountably barred the investigator from testifying about Cole's misstatements in order to undermine his credibility further. That was error by the judge. *United States v. Lashmett*, 965 F.2d 179, 182 (7th Cir. 1992).

The defense presented an expert witness at trial, Michael Alerding, whom the judge allowed to testify—but not as an *expert* witness. Yet Alerding, the defense pointed out at the trial without contradiction, is a certified public accountant with 43 years of experience in auditing and accounting and 25 years as a consultant *and expert witness* in litigation involving his specialties, which encompass the present case; and he was prepared to testify that the defendant's business was basically sound. The judge, however, has a rule that an expert witness is not to be called an expert in front of the jury, lest the jurors be awed and think the witness infallible. Our court has not considered this rule as yet, but it has been accepted by other courts, see *United States v. Johnson*, 488 F.3d 690, 697 (6th Cir. 2007); *United States v. Bartley*, 855 F.2d 547, 552 (8th Cir. 1988), and the ABA likewise recommends that trial courts not endorse witnesses as "experts." American Bar Association, *Civil Trial Practice Standards* (August 2007), 29.

But the judge confused her rule about *calling* Alerding an "expert" in the presence of the jury with the question whether he could testify as an expert at all under governing Rule 702 of the Federal Rules of Evidence, which provides that a "witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." As a result of this confusion the judge permitted Alerding to give only lay testimony and pre-

vented him from discussing typical small businesses (which he wanted to compare to the defendant's business) on the ground that by doing so he would be straying into "expert witness" territory. By substituting its muddled admissibility standard for the Rule 702 framework set forth in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), the district court again erred.

A government agent named Janet DeLancey testified that payments made by the defendant to the investors in his business were "lulling payments," that is, payments designed to lull the investors into thinking they were receiving the money to which they were entitled, when they were not. But they were; the defendant's firm *was* contractually obligated to make the payments to its investors. The district judge had acknowledged before trial that terming a payment a "lulling payment" was "argumentative and ha[d] the potential to prejudicially influence the jury" if used in summary evidence. But inconsistently, at the trial she permitted DeLancey to repeat her fraud accusation more than a dozen times. Agent DeLancey, a lay *summary* witness, should not have been permitted to offer such opinion testimony. The conclusion regarding intent was the jury's to make. *United States v. Marzano*, 537 F.2d 257, 268 (7th Cir. 1976).

The judge's worst mistake, however, was to allow the government in closing argument to compare the defendant to Bernard Madoff. It was like comparing Judge Pratt to Pontius Pilate. The defendant does not challenge the amount of restitution that he was ordered to pay to those investors whom he had defrauded: $293,171.84; but the infamous Madoff is estimated to have defrauded his investors of between $12 billion and $20 billion (see his *Wikipedia* entry, https://en.wikipedia.org/wiki/Bernard_Madoff#size_of_loss_to_investors). At $12 billion that is 40,000 times the fraud committed by Lopez; at $20 billion it is more than 68,000 times Lopez's fraud. There is no comparison; it's no surprise that Madoff was sentenced to 150 years [i.e., life] in prison,

compared to the 57 months of prison to which our defendant was sentenced. The only purpose and effect of bringing Madoff into the picture in this case were to exaggerate the defendant's crime. That was disreputable conduct by the Justice Department.

The defendant's convictions should be vacated and the case remanded for a new trial.