In the

# United States Court of Appeals

## For the Seventh Circuit

No. 14-1526

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

MICHAEL DEMARCO,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 12 CR 389 — **John W. Darrah**, *Judge.*

ARGUED DECEMBER 4, 2014 — DECIDED APRIL 24, 2015

Before BAUER, RIPPLE, and SYKES, *Circuit Judges.*

BAUER, *Circuit Judge.* A jury convicted defendant-appellant, Michael DeMarco ("DeMarco"), of one count of wire fraud, *see* 18 U.S.C. § 1343, and the district court sentenced him to forty-eight months' imprisonment. DeMarco appeals his conviction, arguing the district court made two erroneous evidentiary rulings which substantially prejudiced his defense. He also contests his sentence, claiming that the district court erred by applying a two-level increase to his base offense level for both

abuse of a position of trust, *see* U.S.S.G. § 3B1.3, and the use of sophisticated means, *see* U.S.S.G. § 2B1.1(b)(1). For the reasons set forth below, we affirm.

## I. BACKGROUND[1]

In January 2007, Michael Suarez ("Suarez"), a seventy-five year old widower from Mexico, visited a JPMorgan Chase Bank located in Vernon Hills, Illinois, to open a checking account. Michael DeMarco, the bank branch manager and assistant vice president, approached Suarez and assisted him in opening the account. DeMarco and Suarez eventually became friends. They spoke with one another about personal matters every week or so when Suarez would go to the bank to withdraw cash. During one of these conversations, Suarez told DeMarco that he was trying to sell his three acre property in Lincolnshire, Illinois, then listed with Coldwell Banker for $1.8 million. DeMarco told Suarez that he was "in charge of a lot of very wealthy people's accounts" and that he could help Suarez sell the property.

DeMarco convinced Suarez to break his contract with Coldwell Banker, indicating that he had a buyer for the property. DeMarco told Suarez that he needed a home equity line of credit ("HELOC") on the property in order to complete the sale. After unsuccessfully submitting HELOC applications with Chase Bank and Wells Fargo, DeMarco obtained a HELOC, under Suarez's name and secured by Suarez's property, from Bank of America, in the amount of $250,000.

---

[1] The following facts are recited from the testimony and evidence produced at trial.

On June 8, 2007, DeMarco joined Suarez at a Bank of America branch located in Buffalo Grove, Illinois, to close on the HELOC. DeMarco provided the Bank of America representative who handled the closing, Dhara Patel, with his account details and requested that the $250,000 in HELOC proceeds be deposited directly into his personal account at Chase Bank. DeMarco also had his work address (325 Milwaukee Avenue, Vernon Hills, Illinois) listed as the "home address" of the borrower, even though Suarez was listed as the "borrower" on the HELOC.

On June 21, 2007, the HELOC proceeds were transferred via wire into DeMarco's personal account at Chase Bank. However, because the account holder (DeMarco) did not match the name of the borrower on the HELOC (Suarez), the wire transfer was reversed the following day. DeMarco then caused Bank of America to transfer the HELOC proceeds into a joint checking account, which he opened in both his and Suarez's name and which listed DeMarco's home address as the address of record on the account. After the HELOC proceeds were transferred to the joint account on June 27, 2007, DeMarco withdrew $245,000 of the $250,000 from the joint account and deposited the funds into his personal account at Chase Bank. After Chase Bank terminated his employment on August 22, 2007, DeMarco transferred the funds into two accounts he opened at National City Bank.

DeMarco spent the vast majority of the HELOC proceeds to pay off his credit card debt, make a down-payment on his home and on a Lexus SUV, pay off his two cars (a Mazda and Mercedes), finish his basement, and go on vacations to Hawaii,

Mexico, and the Wisconsin Dells. He used a small fraction of the money to pay off various debts that Suarez had incurred.

In late July or early August 2007, Suarez went to a Chase Bank branch located in Libertyville, Illinois, to review copies of his Chase checking account statement. Upon doing so, he identified various irregularities with respect to his statement for July 2007. He brought this to the attention of a Libertyville Chase banker and was informed that he may have been the victim of some sort of fraud. Suarez then contacted Federal Bureau of Investigation ("FBI") Special Agent Daniel McCune to discuss his dealings with DeMarco. After speaking with Suarez, Agent McCune launched an investigation; as a result of this investigation, an indictment charging DeMarco with one count of wire fraud in violation of 18 U.S.C. § 1343 was returned in the Northern District of Illinois on May 23, 2012.

DeMarco proceeded to trial on the charge. At trial, the government presented the testimony of Suarez, Agent McCune, and Dhara Patel. Suarez testified that DeMarco told him that Chase Bank would purchase his property for $2.6 million. He testified that, at DeMarco's direction, he went to a Bank of America branch located in Buffalo Grove, Illinois, to attend what he thought was a closing on the sale of his property. Eventually, Suarez realized that the meeting did not relate to the sale of his property, but rather to open a line of credit for $250,000. DeMarco told him that the HELOC was necessary to consummate the sale of his property.

Suarez testified that DeMarco rushed him through the HELOC closing and told him to sign numerous documents before he had a chance to read them. He testified that he and

DeMarco never discussed where the HELOC proceeds would be deposited nor did he ever know that DeMarco arranged to have the proceeds transferred to his (DeMarco's) personal account at Chase Bank. Suarez said that he never questioned DeMarco because he "had confidence in him" and thought that DeMarco, as a bank branch manager and assistant vice president, knew what he was doing.

After the HELOC closing, Suarez never spoke to or saw DeMarco again. Every time Suarez tried to contact DeMarco, he was met with an excuse—for example, he was told DeMarco was "downtown at a meeting," "with a client," or "out to lunch." Suarez also testified that he never agreed to pay DeMarco a commission for selling his property; he never agreed to open a joint checking account with DeMarco; he never agreed to give DeMarco any portion of the $250,000 in HELOC proceeds; and he never asked DeMarco to pay off any of his debts.

Agent McCune testified that, as part of his investigation, he went to DeMarco's home to interview him. During the interview, DeMarco initially told him that Suarez had given him the HELOC proceeds as a gift but subsequently admitted this was not true, instead saying that Suarez had taken him on as a sales agent for the sale of his property. Agent McCune testified that DeMarco said he located a developer, through a bank client, to purchase the property but could recall neither the name of the customer nor the buyer. Agent McCune testified that DeMarco ultimately admitted that he lied to Suarez when he told him that he found a developer who agreed to purchase the property for $2.6 million. Finally, Agent McCune testified that

DeMarco admitted that Suarez trusted him and that he abused that trust.

Dhara Patel, the Bank of America representative who handled the HELOC closing, testified that DeMarco rushed her through the closing in order to keep her from fully explaining the HELOC documents to Suarez. She also corroborated Suarez's testimony that DeMarco pushed him to sign documents before he had a chance to review them. She testified that DeMarco did not attempt to explain the documents to Suarez and that Suarez did not appear to fully understand what was going on during the closing.

DeMarco was the only defense witness. He testified that he had not intended to defraud Suarez; that the two had entered into a legitimate oral agreement for him to sell Suarez's property. According to DeMarco, Suarez agreed to pay him a commission of ten to twelve percent of the sale price, in the event that he was able to sell the property. DeMarco testified that he found a developer to purchase the property, however, because the developer needed a couple of months before he could complete the sale, DeMarco convinced Suarez to take out a HELOC so that he could immediately receive his commission and Suarez could begin paying off various debts.

DeMarco testified that Suarez participated in every step of the HELOC process. He testified that Suarez agreed to having the HELOC proceeds deposited in his (DeMarco's) personal account at Chase Bank; that Suarez authorized him to open a joint checking account in his and Suarez's name; and that Suarez agreed to having the HELOC funds transferred from the joint checking account to his (DeMarco's) personal account.

DeMarco testified that on August 23, 2007, the unidentified developer he found to purchase the property informed him that the deal was off. According to DeMarco, he tried to contact Suarez to tell him that the deal had fallen through, but despite his efforts, which he admitted were rather minimal, he could not get in touch with Suarez. DeMarco then spent the remaining $114,000 in HELOC proceeds on himself and his family. DeMarco admitted that Suarez trusted him to "do the right thing" and that he "obviously did him [Suarez] wrong."

The jury found DeMarco guilty of one count of wire fraud in violation of 18 U.S.C. § 1343. In anticipation of sentencing, the United States Probation Office prepared a presentence report ("PSR"). The PSR recommended a two-level enhancement pursuant to the United States Sentencing Guidelines § 2B1.1(b)(10)(C) because DeMarco's fraud involved the use of sophisticated means, but rejected a two-level enhancement for abuse of a position of trust.

DeMarco filed an objection to the PSR's enhancement for sophisticated means; the government argued in response that enhancements for both abuse of a position of trust and sophisticated means were appropriate. Agreeing with the government, the district court applied both enhancements and determined that DeMarco's total offense level was 27. Coupled with a criminal history category of I, DeMarco faced an advisory Sentencing Guidelines range of 70–87 months' imprisonment. The district court sentenced DeMarco to a below-Guidelines term of forty-eight months' imprisonment. DeMarco appeals both his conviction and sentence.

## II.  DISCUSSION

### A.  DeMarco's Conviction

Challenging his conviction, DeMarco argues the district court made two erroneous evidentiary rulings which substantially prejudiced his defense. We review evidentiary rulings for abuse of discretion, *United States v. Neighbors*, 590 F.3d 485, 496 (7th Cir. 2009), subject to a harmless error analysis. *United States v. Thornton*, 642 F.3d 599, 604 (7th Cir. 2011); Fed. R. Crim. P. 52(a). To determine whether an evidentiary error is harmless, we consider whether, to the average juror, the prosecution's case would have been significantly less persuasive absent the error. *Thornton*, 642 F.3d at 605 (citing *United States v. Cooper*, 591 F.3d 582, 590 (7th Cir. 2010)).

### 1.  Prior Inconsistent Statement

DeMarco first argues that the district court wrongfully prohibited him from introducing a prior inconsistent statement that Suarez made to Agent McCune. The purported inconsistency is this: Suarez told Agent McCune during an investigatory interview that DeMarco promised him that a "builder" was interested in purchasing his property, yet Suarez testified at trial that DeMarco identified Chase Bank as the buyer. In response to defense counsel's questioning on cross-examination, Suarez denied ever telling Agent McCune that DeMarco identified a builder as the party interested in purchasing his property. Following the completion of Suarez's testimony, DeMarco sought to elicit testimony from Agent McCune regarding Suarez's prior inconsistent statement. The government objected and the district court sustained the objection, deeming Agent McCune's proposed testimony to be extrinsic

evidence on a collateral issue and thus inadmissible under Federal Rule of Evidence 608(b).

Pursuant to Rule 608(b), "extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's character for truthfulness." But the rule permits extrinsic evidence to be admitted for other reasons, such as to show bias, contradiction, or inconsistent statements. *United States v. McGee*, 408 F.3d 966, 982 (7th Cir. 2005). Indeed, Rule 613(b) expressly permits the use of extrinsic evidence to impeach a witness. It states in relevant part:

> Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given an opportunity to examine the witness about it, or if justice so requires. Fed. R. Evid. 613(b).

DeMarco specifically asked Suarez about the prior inconsistent statement he made to Agent McCune, thus providing Suarez an opportunity to explain or deny the statement. Suarez denied making the statement to Agent McCune. Pursuant to Rule 613(b), DeMarco was then entitled to elicit testimony from Agent McCune regarding Suarez's prior inconsistent statements in order to perfect impeachment. Accordingly, the district court erred in prohibiting DeMarco from impeaching Suarez under 608(b).

Even though we conclude that the district court's evidentiary ruling was erroneous, we will reverse and order a new trial only if the error was not harmless. *United States v. Boros*, 668 F.3d 901, 910 (7th Cir. 2012); *see also* Fed. R. Crim. P. 52(a).

Given the evidence presented in support of conviction, DeMarco cannot establish that the government's case would have been significantly less persuasive to the jury had DeMarco been able to perfect the impeachment of Suarez.

DeMarco admitted to the key aspects of the fraud in his trial testimony and statements to law enforcement. At trial, DeMarco admitted that he convinced Suarez that he needed a HELOC to consummate the sale of his property, that he caused the HELOC proceeds to be deposited into accounts which he controlled, and that he spent nearly all the HELOC proceeds on himself and his family. The jury also heard Agent McCune's testimony that DeMarco admitted during a pre-trial interview that he lied to Suarez when he told him that an unidentified builder was willing to purchase his property. Although DeMarco denied making this admission at trial, he admitted to lying to Agent McCune when first approached about his fraudulent activities and to fabricating his educational back-ground on an Internet employment profile (LinkedIn). More-over, aside from DeMarco's own testimony, the record does not contain a shred of evidence from which it could be inferred that DeMarco's purported buyer was anything but fictitious. For these reasons, the jury plainly rejected DeMarco's self-serving testimony and determined that he lied to Suarez about having a buyer for the property.

DeMarco argues that Suarez's identification of Chase Bank as the purported purchaser, as opposed to some unidentified builder, made it more likely that a jury would find his repre-sentations fraudulent since it is common knowledge that Chase Bank is not in the business of purchasing property. This argument is not the least bit persuasive. Irrespective of

DeMarco's unsupported claim regarding how widespread the knowledge of Chase Bank's involvement in the real estate market is, the identity of the individual or entity that DeMarco promised would buy Suarez's property is not germane to the central question of whether or not DeMarco defrauded Suarez. The fact remains that the jury did not believe that DeMarco had *any* willing buyer—Chase Bank, an unidentified builder, developer, or otherwise—for the property.

DeMarco also argues that the district court's decision to preclude testimony regarding Suarez's aforementioned prior inconsistent statement "shut down any opportunity" to raise other prior inconsistent statements that Suarez made to law enforcement. Although DeMarco alludes to multiple inconsistencies, he only identifies one concretely. He contends that but for the district court's erroneous ruling, he would have been able to elicit testimony from Agent McCune regarding Suarez's prior statement that he willingly participated in the HELOC application, with the understanding that DeMarco was securing the HELOC to consolidate his debt and facilitate the development of his property. At no point in DeMarco's lengthy cross-examination of Suarez did he ask Suarez about this prior inconsistent statement. Thus, even if DeMarco had sought to impeach Suarez through Agent McCune's testimony, that extrinsic evidence would have been properly precluded under Rule 613(b) since Suarez had not been given an opportunity to explain or deny the statement. *See, e.g.*, *United States v. Johnson*, 956 F.2d 460, 465 (7th Cir. 1992); *Gong v. Hirsch, M.D.*, 913 F.2d 1269, 1274 (7th Cir. 1990); *United States v. Elliot*, 771 F.2d 1046, 1051 (7th Cir. 1985).

### 2. Admission of Testimony Disclosing Redacted Information

Invoking Federal Rule of Criminal Procedure 16(a)(1)(E)(i), DeMarco argues that the district court abused its discretion in permitting Agent McCune to testify to information contained in a redacted portion of the HELOC agreement ("Government Exhibit Line of Credit Records"). We outline the relevant facts below.

In 2010, approximately two years prior to trial, the government provided DeMarco with discovery pursuant to Federal Rule of Criminal Procedure 16. Included with this discovery was a redacted copy of the HELOC agreement that Suarez entered into with Bank of America for $250,000. The version of the HELOC agreement turned over to DeMarco listed the borrower's name as "Michael Suarez" but had the borrower's address redacted. In an unredacted version of this document, the borrower's address is listed as 235 Milwaukee Avenue, Vernon Hills, Illinois—the address of the Chase Bank where DeMarco worked.

During DeMarco's cross-examination of Suarez, defense counsel asked Suarez whether everything in the HELOC agreement was listed under his name and address. After Suarez confirmed this to be the case, defense counsel asked Suarez if he recalled receiving notifications concerning where the HELOC proceeds had been disbursed. Suarez denied receiving any such notifications and went on to testify that the address listed as the borrower's address on the HELOC agreement was the address of the Chase Bank where DeMarco worked. Following the completion of Suarez's testimony,

defense counsel requested, for the first time, that the government provide him with an unredacted copy of the HELOC agreement. The government located an unredacted copy of the agreement and showed it to defense counsel.

The government then called Agent McCune to the stand. The government asked Agent McCune to disclose the address that appeared in the redacted portion of the HELOC agreement in order to rebut the implication that Suarez's address was listed as the borrower's address and to corroborate Suarez's testimony that he had not received notifications regarding distribution of the HELOC proceeds. DeMarco objected and, following a lengthy exchange between the district court and defense counsel, the court permitted Agent McCune to testify that the address listed as the borrower's address in the redacted portion of the HELOC agreement was indeed the address of the Chase Bank where DeMarco worked.

DeMarco claims that the government violated Federal Rule of Criminal Procedure 16(a)(1)(E)(i) by using the redacted information in its case-in-chief, since he was not provided with an unredacted copy beforehand. But DeMarco was provided with a redacted copy of the agreement more than two years before the start of trial and at no point during that period did he request an unredacted version. Since DeMarco intended to argue at trial that Suarez's address appeared on the HELOC agreement as the borrower's address, he should have requested an unredacted copy of the agreement to confirm that this fact was supported by the evidence. By failing to do so, DeMarco proceeded at his own peril. Indeed, defense counsel twice admitted during the post-objection colloquy with the district court that it was his "mistake" that he did not seek to

obtain an unredacted copy of the HELOC agreement during his trial preparation. DeMarco cannot fail to use due diligence and then, after eliciting incriminating testimony, seek to argue that the government violated its discovery obligations. Moreover, it is hard to see how DeMarco could have been "unduly surprised" with respect to the redacted information since he completed the HELOC documents and supplied the address.

## B. DeMarco's Sentence

DeMarco challenges his sentence, arguing that the district court improperly applied Guidelines enhancements for abuse of a position of trust, *see* U.S.S.G. § 3B1.3, and the use of sophisticated means, *see* U.S.S.G. § 2B1.1(b)(10)(C). We review the district court's interpretation and application of the United States Sentencing Guidelines *de novo* and its findings of fact for clear error. *United States v. Ellis*, 440 F.3d 434, 436 (7th Cir. 2006) (citing *United States v. Bothun*, 424 F.3d 582, 586 (7th Cir. 2005)); *United States v. Baldwin*, 414 F.3d 791, 798 (7th Cir. 2005) (discussing sentencing review post-*Booker*).

### 1. Abuse of a Position of Trust

United States Sentencing Guidelines § 3B1.3 authorizes a two-point sentencing enhancement when a defendant "abused a position of public or private trust … in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. We employ a two-part test to determine whether the abuse of trust enhancement is appropriate: (1) whether the defendant occupied a position of trust, and (2) whether the defendant's abuse of that position of trust facilitated his commission or concealment of the crime. *United*

*States v. Cruz*, 317 F.3d 763, 766 (7th Cir. 2003). In determining whether the defendant occupied a position of trust, we analyze the situation from the perspective of the victim. *United States v. Hathcoat*, 30 F.3d 913, 919 (7th Cir. 1994). A formal position of trust is not necessary under § 3B1.3, *United States v. Mabrook*, 301 F.3d 503, 510 (7th Cir. 2002), rather, courts should look beyond labels and categories that characterize the relationship and focus on the nature of the defendant's relationship to the victim and the level of responsibility he was given. *Id*.

Under the facts given here, the district court properly applied a two-level enhancement pursuant to § 3B1.3. DeMarco admitted that he befriended and gained the trust of an elderly bank customer. He told Suarez that he was "in charge of a lot of very wealthy people's accounts" and that he could help Suarez sell his property. Suarez testified that he believed that DeMarco would be able to use his position at Chase Bank to help him sell his property. Suarez also testified that DeMarco convinced him that a HELOC was necessary to complete the sale of his property and that he did not question DeMarco regarding the HELOC or distribution of the HELOC proceeds because he had "confidence in him [DeMarco]." Moreover, Suarez allowed DeMarco to control the HELOC closing and signed the HELOC agreement at DeMarco's direction, even though he did not fully understand the agreement at the time of signing. These facts are more than sufficient to show that DeMarco used his position at Chase Bank in order to convince Suarez that he had a buyer for the property, persuade him that a HELOC was necessary to consummate the sale, and control the events that took place at the HELOC closing. DeMarco himself admitted that Suarez trusted him to "do the right

thing" in this financial transaction and that he abused this trust. Accordingly, the district court did not err in enhancing DeMarco's sentence for abuse of a position of trust.

### 2. Sophisticated Means

United States Sentencing Guidelines § 2B1.1(b)(10)(C) provides for a two-level sentencing enhancement if the offense involved sophisticated means. Sophisticated means is defined as "means especially complex or especially intricate offense conduct pertaining to the execution or concealment of the offense." U.S.S.G. § 2B1.1 cmt. n.9(B). Application of the enhancement is proper "when the conduct shows a greater level of planning or concealment than the typical fraud of its kind." *United States v. Knox*, 624 F.3d 856, 871 (7th Cir. 2011); *see also United States v. Kontny*, 238 F.3d 815, 821 (7th Cir. 2001) (concluding that "sophisticated," as used in an analogous adjustment for tax frauds under U.S.S.G. § 2T1.1, refers to efforts "that go beyond" but "not necessarily far beyond" the typical case). DeMarco contends that his conduct was an isolated instance of fraud which did not entail a greater level of planning or concealment than the garden-variety wire fraud. We disagree.

Over the course of several months, DeMarco befriended an elderly customer at the bank where he was a branch manager and an assistant vice president. Shortly after he discovered that Suarez owned a property worth upwards of $1.8 million, DeMarco caused Suarez to delist his property with Coldwell Banker so as to ensure it was not sold before the completion of his scheme. DeMarco convinced Suarez to obtain a HELOC on the property, and, using his HELOC expertise, submitted

multiple HELOC applications in Suarez's name to multiple banks. DeMarco made sure to attend the HELOC closing in order to misrepresent his work address as that of the borrower on the HELOC agreement. He also fraudulently opened a joint checking account in his and Suarez's name, which listed his home address, rather than Suarez's, as the address of record. DeMarco took these steps to facilitate his access to the HELOC funds and to ensure that he, rather than Suarez, received any notifications regarding the HELOC in order to postpone detection. *See United States v. Wayland*, 549 F.3d 526, 527 (7th Cir. 2008) (holding enhancement proper, in part, because the defendant fraudulently registered both a post office box and joint checking account in his and a fictitious in-home assistant's names to facilitate receipt of fraudulently acquired Medicare funds); *United Stated v. Robinson*, 538 F.3d 605, 607–08 (7th Cir. 2008) (holding enhancement proper where defendant included a false telephone number on checks that, if dialed, allowed the defendant to personally misrepresent the legitimacy of the check to the caller); *United States v. Maddox*, 551 Fed. Appx. 275, 276 (7th Cir. 2014) (not selected for publication) (holding enhancement proper where the defendant changed the mailing address on a victim's personal bank account "so that the bank statements would be sent to post office boxes rather than the victim, postponing detection"). The foregoing scheme is not merely an isolated instance of fraud, as DeMarco claims. Rather, given the myriad of steps involved, including DeMarco's manipulation of the HELOC agreement and joint account, we cannot say that the district court clearly erred in enhancing DeMarco's sentence for the use of sophisticated means.

### III.  CONCLUSION

For these reasons, DeMarco's conviction and sentence are AFFIRMED.