In the

# United States Court of Appeals

## For the Seventh Circuit

No. 17-3421

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

LUIS A. FERNANDEZ,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 2:17-cr-00052-PP-1 — **Pamela Pepper**, *Judge.*

ARGUED SEPTEMBER 13, 2018 — DECIDED FEBRUARY 4, 2019

Before FLAUM, MANION, and ROVNER, *Circuit Judges*.

ROVNER, *Circuit Judge.* A jury convicted Luis Fernandez of being a felon in possession of a firearm, *see* 18 U.S.C. § 922(g)(1). Fernandez appeals his conviction, contending that the district court committed three evidentiary errors that deprived him of a fair trial. We affirm.

**I.**

The charge against Fernandez arose out of a traffic stop conducted by police in Franklin, Wisconsin (a Milwaukee suburb) on November 20, 2016. Fernandez was sitting in the front passenger seat of a black Chevrolet Caprice, his friend Adam Voecks was driving, and Voecks' fiancée Valerie Stramowski was in the back seat. Police officer Gabriel Frusti initiated the stop after observing the car move across multiple lanes of traffic without signaling and quickly decelerating to a halt. (Voecks would later testify that the car's engine had died.) Moments later, officer Adam Rogge arrived on the scene in response to Frusti's request for backup. When Rogge approached the driver's side of the vehicle to speak with Voecks (Frusti was speaking with Fernandez on the passenger side), he noticed an odor of marijuana emanating from the interior of the car. Voecks was asked to step out of the car. When asked if he was armed, Voecks disclosed that he had a gun in his right front pocket; officers removed a holstered Kel Tec .380 caliber pistol from that pocket.

Ultimately all three of the occupants of the car were taken into police custody. Although Voecks had no criminal record and had purchased the gun found on his person legally, he did not have a permit to carry a concealed weapon and was arrested on that basis. Fernandez and Stramowski were arrested on outstanding warrants, and Stramowski had also given the officers a false name in an attempt to evade arrest.

When the interior of the car was searched, police discovered a second gun—a Springfield Armory .45 caliber pistol—in the center console between the front driver and passenger

seats. A pat-down of Voecks' person also produced a folding knife, a crack pipe, and two bullets, one of which was a .38 caliber bullet (the same caliber as the pistol found in his pocket) and the second of which was a .45 caliber bullet (the same caliber as the pistol discovered in the console).

The occupants of the car were transported in a police van to the Franklin police department for processing and questioning. As Fernandez was being placed into the van, officer Adam Graf overheard him call out to Voecks, "[D]on't worry[,] it's only a misdemeanor for you to have a gun." R. 40 at 90; *see also* R. 40 at 128.

Voecks was interviewed twice at the police station, and over the course of the two interviews he gave three different statements as to who had possessed the .45 caliber pistol found in the car and who had placed it in the center console. Officer Frusti conducted both interviews (with officer Rogge sitting in). During the first interview, Voecks claimed ownership of that gun and told Frusti that he had obtained it from a friend who had since died. Voecks was subsequently bailed out of jail by his father. As he was preparing to leave the station, Sergeant Dan Morris approached Voecks and warned him that the police would run a trace on the gun, and if they discovered that the gun had been used in any crime, "it was going to come back on [him]." R. 40 at 135. Voecks at that point became visibly pale and nervous, and Morris offered him the opportunity to be interviewed for a second time about the gun; Voecks accepted the invitation. During the second interview, Voecks told Frusti that the gun was *not* his. At first Voecks said that he did not see who had placed it in the center console of the car, although he suggested it was more likely that Fernandez had

done so than Stramowski. But when he was confronted with certain inconsistencies in that new version of events, Voecks ultimately averred that the gun belonged to Fernandez. Voecks stated that when officer Frusti had pulled up behind the car, Fernandez had panicked, voicing concern that he could "go away for 20 years" and not be able to see his four children. At Fernandez's urging, Voecks had agreed to claim possession of the gun. While Frusti was calling for backup, Fernandez had placed the gun into the center console. Voecks picked up a bullet from the gun that had landed on his seat and placed it into his pocket.

Voecks became the key prosecution witness against Fernandez at trial. (No fingerprints were found on the .45 caliber pistol, and the government had not had the gun tested for DNA evidence.) Voecks explained that he had first claimed ownership of the .45 caliber pistol in order to protect his friend, Fernandez, but changed his mind after being warned that he would be implicated if the police discovered that the gun had been used in a crime. When defense counsel was cross-examining Voecks regarding the divergent accounts he had given to police as to whom the gun belonged, the district court sustained hearsay objections to questions as to what officer Frusti had asked of or said to Voecks during questioning. R. 40 at 150–51, 152, 155. Defense counsel was able to ask Voecks what he had told Frusti, but not what he was responding to. On certain points, Voecks professed an inability to recall what specifically he had said to Frusti. In particular, when defense counsel asked Voecks about his second story regarding the gun, Voecks said that he lacked any recollection of telling Frusti that he did not see who placed the .45 caliber pistol in

the center console of the car. R. 40 at 154–55. "I'm not saying I didn't say it, I'm just saying I don't remember saying that," Voecks testified. R. 40 at 155. But he did otherwise acknowledge the first and third accounts he had given Frusti as to whom the gun belonged and how it had come to be in the center console of the car.

When Frusti subsequently testified for the government, defense counsel attempted to cross-examine him about the various statements Voecks had made to him during the two interrogations Frusti had conducted. But the court sustained the government's hearsay objections to such questions. R. 40 at 182, 186; *see also* R. 40 at 220. Thus, for example, when defense counsel asked Frusti what Voecks had said during the initial interrogation, the court sustained a hearsay objection, although counsel was then able to elicit from Frusti (without objection) that Voecks' initial account involved him having obtained the .45 caliber gun from another individual. R. 40 at 182. When the cross-examination turned to the second interrogation (after Voecks had posted bail), defense counsel was able to elicit from Frusti what he said to Voecks during that interrogation, but (with one exception) not what Voecks said in response to questioning. R. 40 at 186. The defense was only able to have Frusti confirm that Voecks gave inconsistent accounts with respect to the gun. R. 40 at 187–88.

Voecks, when he was on the witness stand, was also cross-examined regarding certain text messages he allegedly sent to Stramowski in the days immediately before trial. The two were no longer engaged at that point, and Voecks had recently become aware that Stramowski and Fernandez either were or had been in a relationship with one another. Voecks admitted

that the news made him angry. R. 40 at 139. The purported texts from Voecks to Stramowski stated, among other things:

> Have fun talking to your[ ] Boyfriend cause he's gonna do 20-life! I'm testifying, he's f*cked. Hope it's worth it[,] look what he did. To both of us … .

> I told u a[ ]long time ago, only one of us would survive, and it wouldn't be him! Either way he's f*cked whether it's by my hands or the court['s]. …

> Ur both gonna get urs[.]

> I met with the usa[ ] prosecuting attorney. Luis is f*cked. He done a[n]d a fed inmate for life! Keep wasting ur money on him. …

R. 46–2 at 2–6 (sanitizing ours); *see also* R. 40 at 159–61. Stramowski had provided screen-shots of these texts to defense counsel (who in turn produced them to the government's counsel) midway through the first day of trial, just before opening statements were to commence. The government objected to any reference to the texts; but as the texts were probative of Voecks' potential bias and motive to testify, the district court allowed the defense to cross-examine Voecks about the texts, as defense counsel had proposed, but indicated that the defense would not be permitted to introduce extrinsic evidence of the texts. R. 40 at 36–37, 39–40, 221–22. During the cross-examination of Voecks, counsel established that he had sent texts to Stramowski in advance of the trial and that his cell phone number was the same as the number from which the texts on Stramowski's phone purportedly came. Counsel then read several of the texts to Voecks and asked him whether he

had sent them to Stramowski. In each instance, Voecks answered that he did not recall sending such a text to her.

Stramowski subsequently testified as a defense witness. She indicated that she had not seen any guns in the car on the date of the traffic stop, nor had she heard any discussion between Voecks and Fernandez regarding the .45 caliber weapon later discovered in the console. She testified that Voecks owned multiple guns and at one point had possessed as many as five when she was living with him. When defense counsel attempted to ask her about the substance of texts she claimed to have received from Voecks in the run-up to the trial, the district court sustained the government's hearsay objection. R. 40 at 205. Stramowski did confirm that Voecks was upset to learn that she was in a relationship with Fernandez, and that he told her he was going to "get back at [her]" for that. R. 40 at 205–06.

At the conclusion of the trial, the jury found Fernandez guilty of the felon-in-possession charge; and the district court later denied his motion for a new trial. The court noted that despite the hearsay objections it had sustained when the defense had attempted to ask Voecks what officer Frusti had said while interrogating him and to ask Frusti how Voecks had responded to Frusti's questions, the defense had managed to establish how Voecks' story had evolved during questioning. R. 62 at 9–10. As to the texts Voecks had allegedly sent to Stramowski, the court pointed out that the defense had read those texts to Voecks on cross-examination, so that the jury was aware of what the texts said notwithstanding the fact that the court had not allowed the defense to present extrinsic evidence of the texts. R. 62 at 16–18.

At sentencing, Judge Pepper ordered Fernandez to serve a prison term of 27 months, which was at the low end of the range advised by the Sentencing Guidelines.

**II.**

A. Hearsay objections regarding police interrogation of Voecks

There is no dispute that Voecks gave Frusti contradictory accounts as to whom the .45 caliber gun belonged and who had placed it in the center console of the car. As the interrogations of Voecks were recorded and transcribed, the parties knew exactly what Frusti had said to Voecks during the questioning and what Voecks had said to Frusti in response. Frusti and Voecks both testified at trial, and the defense wanted leeway to question each of them about both sides of the interrogation; but as noted, when the defense attempted to ask Voecks about what Frusti had said to him and vice-versa, the district court sustained the government's hearsay objections, essentially confining the cross-examination of each witness to his own statements.

Fernandez argues that the district court erred in imposing these limitations. He contends that "[t]he government's case against Fernandez depended entirely on the credibility of Adam Voecks, … [s]o it was essential for the defense to highlight each step in Voecks' ever-evolving story and to explain what led him to shift blame to Fernandez." Fernandez Br. 8. The district court's hearsay rulings effectively prevented the defense from accomplishing that task, Fernandez asserts, and thus denied him the ability to confront his accuser and present a full defense. It was, in his view, confusing and unnecessary to restrict the cross-examination of Voecks and

Frusti to their respective halves of the interrogations. And because Voecks professed inability to recall certain of the statements he made during questioning, and Fernandez's counsel was prohibited from asking Frusti to fill in those gaps, the defense was unable to establish the full content and context of Voecks' changing stories. Ultimately, in Fernandez's view, the jury was only given the bare outlines of the inconsistent statements that Voecks gave and was kept ignorant of the details which demonstrated how and why his accounts changed. On appeal, Fernandez suggests for the first time that the error was so serious that it deprived him of his Sixth Amendment right to confront Voecks effectively.

We agree it was error to sustain the hearsay objections to questions aimed at eliciting what questions officer Frusti asked of Voecks during the interrogations. It is common ground between the parties that the statements Voecks made during interrogation were fair game for the impeachment of his testimony at trial. *See* Fed. R. Evid. 801(d)(1)(A). To that end, it was entirely reasonable to question Voecks about what he had told Frusti at the police station, and the district court allowed the defense to do so. But interrogations are an inherently interactive process, and so Frusti's half of the interrogations were material to the context of Voecks' answers. What Frusti asked of or said to Voecks during interrogation was not offered for its truth, but rather to establish what questions or statements Voecks was responding to and the effect the former had on Voecks as the listener. This was a legitimate non-hearsay purpose aimed at providing the jury with the full context of Voecks' prior statements. *See, e.g., Estate of Moreland v. Dieter*, 395 F.3d 747, 753–54 (7th Cir. 2005) (recognizing that interroga-

tor's questions were offered to provide context for defendant's answers and as such were not hearsay) (citing *United States v. Woods*, 301 F.3d 556, 561 (7th Cir. 2002) (informant's side of recorded conversation with defendant admissible to provide context)); *United States v. Gajo*, 290 F.3d 922, 929–30 (7th Cir. 2002) (statements of non-conspirator, in recorded conversation with co-conspirator, admissible to provide context for co-conspirator's statements) (collecting cases); *United States v. Gutierrez-Chavez*, 842 F.2d 77, 81 (5th Cir. 1988) (co-defendant's statements introduced not for their truth but only to show they were uttered). The judge may have been misled by the defense's first foray into Frusti's side of the interrogations, which asked Voecks to recount what Frusti had told him on a particular point. R. 40 at 150–51. There may well be instances in which a party improperly seeks to elicit an interrogator's statement during questioning (representing what another witness has told the authorities, for example) for its truth rather than to establish the context of what the person being interrogated said next. If that were the evident aim of defense counsel's questioning here, then we would agree that the inquiries were barred by the hearsay rule. But it soon became clear that Fernandez's attorney was attempting to elicit Frusti's statements and questions for legitimate non-hearsay purposes. Counsel's next question, for example, was what Frusti had asked Voecks, and the court sustained the government's objection to that inquiry as well. R. 40 at 151. Consequently, the hearsay rule did not support the court's decision to preclude the defense from establishing both sides of the interrogations through Voecks himself.

The defense had a legitimate purpose in examining Voecks about the various contradictory stories he had told to Frusti about the gun, and as part of that inquiry it was entirely proper for the defense to establish what Frusti said and asked during the interrogations in order to place Voecks' answers in context. To the extent Frusti may have been leading or cajoling Voecks to change his story, for example, Frusti's side of the interrogations would be relevant to the jury's assessment of Voecks' credibility in pointing the finger at Fernandez. Insisting that Fernandez's counsel instead wait to ask Frusti about his half of the conversations was at best a cumbersome alternative, and one that precluded the defense from eliciting what Voecks understood Frusti to be saying to him.

The converse restriction the court imposed on the cross-examination of Frusti was also problematic, but less troublesome on the record as it stands. Fernandez points out that Voecks professed an inability to recall certain statements he made during the second interrogation, during which Voecks changed course and ultimately attributed possession of the .45 caliber gun to Fernandez. At that point, Fernandez argues, he should have been permitted to establish through Frusti the statements that Voecks was purportedly unable to recall. *See* pursuant to Fed. R. Evid. 613(b)[1]; *United States v. DeMarco*, 784 F.3d 388, 394 (7th Cir. 2015) (extrinsic evidence of witness's prior statement is admissible pursuant to Rule 613(b) for

---

[1] Rule 613(b) provides: "Extrinsic evidence of a witness's prior inconsistent statement is admissible only if the witness is given an opportunity to explain or deny the statement and an adverse party is given the opportunity to examine the witness about it, or if justice so requires."

purpose of impeaching witness so long as witness has first been given opportunity to explain or deny statement); *see also United States v. Lopez*, 870 F.3d 573, 582 (7th Cir. 2017) (construing rule broadly to permit extrinsic evidence even when witness has acknowledged prior statement) (collecting cases). But the logical first step the defense could have taken in this regard was to present Voecks with the transcript of the interrogation and ask him whether that refreshed his recollection as to what he said. *See*, *e.g.*, *United States v. Vasquez*, 635 F.3d 889, 895 (7th Cir. 2011), *cert. dismissed*, 566 U.S. 376, 132 S. Ct. 1532 (2012). If Voecks was responding to these inquiries in good faith, then a review of the transcript might have caused him to recall and acknowledge the statements in question. If so, then the defense's need to question Frusti on these points would have been reduced, as a practical matter, if not eliminated. *But see Lopez*, 870 F.3d at 581 ("[E]ven when a witness admits to making a prior inconsistent statement, Federal Rule of Evidence 613(b) should be read broadly to allow a party 'to introduce extrinsic evidence to emphasize the fact that the witness made the prior statement.'") (quoting *United States v. Lashmett*, 965 F.2d 179, 182 (7th Cir. 1992)). If, at the other extreme, Voecks denied making the statements, then of course it would have been entirely proper to ask Frusti what Voecks had said. *See DeMarco*, 784 F.3d at 394 (once witness has denied making prior statement, Rule 613(b) permits extrinsic proof of that statement). And if, instead of either acknowledging or denying his prior statements, Voecks had continued to profess a lack of recollection, then it would have been up to the district judge to decide whether his professed lapse of memory was genuine. If the court were to conclude that Voecks was simply

being evasive, then establishing his statements through Frusti again would have been permissible. *Cf. United States v. DiCaro*, 772 F.2d 1314, 1322 (7th Cir. 1985) (where district court found witness lied in professing amnesia, court did not abuse its discretion in admitting witness's prior grand jury testimony per Rule 801(d)(1)(A)). On the other hand, if the court believed that Voecks' failure of memory was genuine, then the admissibility of Voecks' prior statements through Frusti would have presented a closer question. *Compare United States v. Brown*, 788 F.3d 830, 834 (8th Cir. 2015) (it is within trial judge's discretion to exclude extrinsic evidence of witness's prior statement where witness asserts in good faith she cannot recall making the statement), *with United States v. Bullcalf*, 563 F. App'x 535, 536 (9th Cir. 2014) (unpublished) (witness's inability to recall prior statement should be treated as denial for purposes of Rule 613(b)). The defense did not attempt to refresh Voecks' recollection using the transcript of his interrogations, so arguably it did not lay the requisite groundwork for admitting the statements through Frusti.[2]

Even assuming, on the broadest reading of Rule 613(b), that the court should have allowed Frusti to be questioned about Voecks' statements once Voecks himself professed not to remember making them, any error with respect to the restrictions imposed on cross-examination of Frusti—as well as Voecks—was harmless. The jury certainly was aware that Voecks gave multiple, contradictory statements to the police

---

[2]  By contrast, the defense did present Frusti with a transcript of the interrogation in order to refresh his recollection as to a point Frusti claimed an inability to recall. R. 40 at 183.

which began with the claim that the gun belonged to him and ended with the claim that the gun belonged to Fernandez. It is true that the defense was not able to elicit every detail of the various accounts that Voecks had given to Frusti. (For example, in his first version, Voecks told Frusti that he had met the man from whom he had obtained the gun at a methadone clinic.) It is also true that the defense was not able to establish the particulars of what prompted Voecks to abandon his second version (that he did not see anyone put the gun into the front-seat console of the car) for his third and final version (that Fernandez put the gun there). However, we are not convinced that such details were vital to the defense. The jury was fully aware that Voecks had first claimed the gun was his, but during the second interrogation had abandoned his first account and claimed the gun was Fernandez's. Critically, the jury was also made aware of the fact that it was the warning from Sergeant Morris that Voecks would be held to account for any crimes connected to that gun which prompted Voecks to reconsider the first story and agree to the second interview, where he ultimately incriminated Fernandez. We can readily appreciate that eliciting the specifics of what Frusti said to and asked of Voecks, and what Voecks said in response, would demonstrate both Voecks' facility with inventing details and his clumsiness in contradicting himself on such key points as to whether he knew there was a gun in the center console of the car. The restrictions imposed on the cross-examinations of Voecks and Frusti made it an unnecessarily difficult task for the defense to lay bare the full evolution and context of Voecks' statements regarding the .45 caliber pistol. But the defense nonetheless was able to establish the gist of the two

contradictory accounts of the gun's ownership and the trigger for Voecks' decision to abandon his original statement and attribute possession of the gun to Fernandez. Defense counsel made full use of the (purportedly self-serving) evolution of Voecks' account in closing argument. R. 41 at 265–68. Fernandez has not shown us why any of the omitted details of Frusti's interrogations of Voecks mattered so much as to demonstrate reversible error. And although Fernandez did not invoke his Confrontation Clause rights below and arguably forfeited any constitutional claim, for the sake of completeness, we note that his ability to raise the essential points as to Voecks' change of story defeats any claim of plain error in this regard.

## B. Admissibility of the text messages

Fernandez next contends that the district court erred in precluding him from questioning defense witness Stramowski about the content of the texts she had purportedly received from Voecks in the run-up to the trial. Once Voecks was confronted with and essentially denied having sent those texts, Fernandez argues, he should have been permitted to introduce extrinsic evidence of the texts in order to establish Voecks' bias against both Fernandez and Stramowski and his motive to inculpate Fernandez at trial. The district court's understanding that Rule 608(b) forbade extrinsic evidence of a witness's prior statements for these purposes was mistaken, he contends.[3]

---

[3] In relevant part, Rule 608(b) provides: "Except for a criminal conviction under Rule 609, extrinsic evidence is not admissible to prove specific instances of a witness's conduct in order to attack or support the witness's

(continued...)

We do not disagree with Fernandez that evidence as to the texts, if they were indeed sent by Voecks, was admissible to establish Voecks' bias and motive as a witness for the government. *See United States v. DeMarco*, *supra*, 784 F.3d at 394 (noting that Fed. R. Evid. 608(b) allows proof of specific instances of conduct to establish bias or prior inconsistent statement) (citing *United States v. McGee*, 408 F.3d 966, 981–82 (7th Cir. 2005)). Statements in the texts to the effect that both Fernandez and Stramowski were going to "get yours" and that, as between Fernandez and Voecks, only one was going to "survive" and it was not going to be Fernandez, certainly could be understood to reflect that Voecks had an axe to grind against Fernandez and a motive to help himself by testifying for the government at Fernandez's expense. Once Voecks was confronted with the texts and effectively denied sending them, the door was opened to extrinsic evidence of the texts pursuant to Rule 613(b), contrary to the district court's understanding. *DeMarco*, 784 F.3d at 394.

But for two reasons, we do not think the district court erred in sustaining the government's objections when the defense began to ask Stramowski about these texts. First, when the matter of the texts was first raised with the district judge prior to opening statements, Fernandez's attorneys indicated that it was *not* their intent to establish the substance of the texts

---

[3] (...continued)

character for truthfulness. But the court may, on cross-examination, allow them to be inquired into if they are probative of the character for truthfulness or untruthfulness of: (1) the witness; or (2) another witness whose character the witness being cross-examined has testified about. …

through extrinsic evidence; instead, counsel simply wanted the opportunity to question Voecks about the texts. R. 40 at 33, 35. The court readily acceded to that limited request. We inquired at oral argument whether, after Voecks had been confronted with the texts and denied having sent them, defense counsel ever argued to the court that circumstances had changed and that the defense should now be permitted to prove the existence and contents of the texts through extrinsic evidence. Counsel answered that question in the negative. The district court can hardly be faulted for barring evidence that the defense had disclaimed an intent to introduce.

Second, given the late hour at which the texts came to light—just as opening statements and the presentation of evidence was about to begin—there was very little opportunity for either party to establish the authenticity of the texts. The court rightly flagged the authenticity of the texts as a concern from the start, and we may safely assume that it would have taken some amount of time to investigate this. But the presentation of evidence at trial began and concluded on the same day that the texts were first raised; and given that the defense had originally indicated it would be satisfied with the opportunity to question Voecks about the texts, the government was not on notice that it needed to task someone to explore the provenance and authenticity of the texts. The district court was thus well within its discretion to prohibit the defense from attempting to provide the existence and content of the texts through Stramowski.

C.  Disclosure of Fernandez's arrest on outstanding warrant

Finally, Fernandez contends that the district court erred in permitting the government to establish that he was arrested during the November 2016 traffic stop on an outstanding warrant for a probation violation. The government argued, and the district court agreed, that the arrest was necessary to complete the picture of what occurred during the stop and in particular to explain why Fernandez was loaded into the police van, which was when officer Graf heard him tell Voecks not to worry about possession of a gun, because that was only a misdemeanor offense for Voecks. Fernandez contends that disclosure to the jury of his arrest and the reason for it amounted to evidence of a prior bad act that was not probative of his guilt on the felon-in-possession charge, and that the court's rationale in allowing it tracks the "inextricably related" rationale of which we disapproved in *United States v. Gorman*, 613 F.3d 711, 717–19 (7th Cir. 2010).

Any potential error in the court's decision to admit this evidence was harmless, however. Because having a prior felony conviction was an element of the offense with which Fernandez was charged, the jury was necessarily aware that he had a criminal record. *See* R. 28 ¶ 1; R. 40 at 189 (stipulation that Fernandez previously had been convicted of a felony offense). That he was also arrested for a probation violation at the time of the traffic stop was a relatively benign fact. Given the limited purpose for which it was admitted, we are not convinced that disclosure of the arrest was unduly prejudicial to Fernandez.

### III.

We AFFIRM the judgment.